## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal No. PWG-20-374** |
| **BRIAN ANTHONY GILBERT** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### DEFENDANT'S SENTENCING GUIDELINES OBJECTIONS

On behalf of the defendant Brian Gilbert, we respectfully submit that the Court should afford little or no weight to the applicable sentencing guidelines as calculated by the Presentence Report. As set forth below, there are two overarching problems with these guidelines. First, the child pornography guidelines are not the product of the careful, empirical approach that the Sentencing Commission traditionally employs. Second, the guidelines include duplicative enhancements that account for the same harms multiple times. The overall effect is a scheme that fails to meaningfully differentiate among offenses and that offers the Court little helpful guidance in calculating the appropriate sentence.

**I.      The child pornography guidelines do not exemplify the Sentencing Commission's characteristic institutional role, and the Court should therefore afford them less weight than typical guidelines.**

Congress has tasked the Sentencing Commission with "writ[ing] Guidelines that will carry out th[e] . . . objectives" in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). That statute seeks to ground sentencing decisions in consideration of, among other things, "offense and offender characteristics"; "the need for a sentence to reflect the basic aims of sentencing, namely, (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation"; and "the need to avoid unwarranted disparities." *Id.* at

347-48.  And the "Commission, in describing its Guidelines-writing efforts, refers to these same" § 3553(a) considerations.  *Id.* at 348.

To achieve these goals, the Commission began the Guidelines-promulgation process with "an empirical examination of 10,000 presentence reports setting forth what judges had done in the past."  *Id.* at 349.  The Commission then "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like."  *Id.*  In doing so, the Commission "base[d] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

Issuance of the resulting Guidelines did not mark the end of the Commission's "empirical approach."  *Rita*, 551 U.S. at 349.  Rather, "[t]he Commission's work is ongoing," and the Guidelines undergo "continuous evolution."  *Id.* at 350.  As district courts provide explanations for imposing non-Guidelines sentences and circuit courts subject those explanations to reasonableness review, the Commission "collect[s] and examine[s] the results," using this trove of data to "revise the Guidelines accordingly." *Id.* at 350.  The Commission also "obtain[s] advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others," all in an effort to determine whether—and ensure that—the Guidelines are serving the "§ 3553(a) objectives."  *Id.* at 348, 350.

It is because of this ongoing, empirical, consensus-driven process that, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Kimbrough*, 552 U.S. at 109.  But not all guidelines result from this technocratic process.  In a handful of

cases, the Commission has based guidelines not on "empirical data and national experience," but on statutory directives from Congress. *Id.* at 109. The guideline governing cocaine offenses, for instance, treats crack substantially more harshly than powder only because Congress has dictated such treatment through mandatory minimum sentences. *See id.* at 96-100, 109. The Supreme Court has recognized that because guidelines of this type "do not exemplify the Commission's exercise of its characteristic institutional role," they are less likely to further "the purposes of sentencing set forth in § 3553(a)." *Id.* at 109-10. And as a result, a district court need not afford those guidelines as much weight or as much deference as it would guidelines that result from the Commission's normal data-driven procedures. *Id.*

**A.    The possession guideline, § 2G2.2, is entitled to less deference than most guidelines because it results from congressional interference and does not meaningfully distinguish between more and less culpable defendants.**

The Court should view U.S.S.G. § 2G2.2, which applies to non-production child pornography offenses such as possession, with skepticism. As its history demonstrates, § 2G2.2 does not "exemplify the Commission's exercise of its characteristic institutional role."

When the Commission promulgated the initial Guidelines in 1987, federal law prohibited the transport, distribution, and receipt of child pornography, but simple possession of child pornography was not yet a federal crime. United States Sentencing Commission, *The History of the Child Pornography Guidelines* 10 (October 2009) [hereinafter, "2009 Report"].[1] The Commission placed transport, distribution, and receipt offenses in § 2G2.2 and set the base offense level at 13, based on a review of pre-Guidelines sentencing practices.

---

[1] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf.

*Id.*   Then, in the Child Protection Restoration and Penalties Enhancement Act of 1990, Congress made simple possession of child pornography illegal for the first time.  *Id.* at 17. The Commission responded by removing receipt from § 2G2.2 and inserting it into a newly promulgated guideline, U.S.S.G. § 2G2.4, that provided a base offense level of 10 for both receipt and possession.  *Id.* at 18-19.  This revision reflected the Commission's view that "receipt is a logical predicate to possession" and is therefore no more culpable.  *Id.* at 19. The new § 2G2.4 contained only a single adjustment: a two-level enhancement if the material involved a prepubescent minor or a minor under the age of twelve years.  *Id.*

Unhappy with the Commission's handiwork, Congress passed a directive instructing the Commission to:

(1) remove receipt offenses from § 2G2.4 and return them to § 2G2.2;

(2) raise § 2G2.2's base offense level from 13 to "not less than 15";

(3) add to § 2G2.2 "at least a 5 level increase for offenders who have engaged in a pattern of activity involving the sexual abuse or exploitation of a minor";

(4) increase the § 2G2.4 base offense level to "not less than 13"; and

(5) add to § 2G2.4 "at least a 2 level increase for possessing 10 or more" images.

Treasury, Postal Service and General Government Appropriations Act, 1992, Pub. L. No. 102–141, § 632, 105 Stat. 834 (1991); *see* 2009 Report at 19-20, 23-24.  The Commission adopted conforming amendments that became effective November 27, 1991.  2009 Report at 24.

The non-production guidelines remained unchanged until December 1995, when Congress passed the Sex Crimes Against Children Prevention Act of 1995 (SCAPA).  *Id.* at 26.  Relevant here, that statute ordered the Commission to:

(1) increase the § 2G2.2 base offense level "by at least 2 levels";

(2) increase the § 2G2.4 base offense level "by at least 2 levels"; and

(3) add an enhancement of "at least 2 levels" to § 2G2.4 for cases in which "a computer was used . . . to transport or ship the visual depiction."

*Id.*; Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104–71, §§ 2-3, 109 Stat. 774 (1995).

The Commission responded by raising the § 2G2.2 base offense level from 15 to 17 and the § 2G2.4 base offense level from 13 to 15—the minimum increases permitted by SCAPA, as the Commission concluded "the data were insufficient to support an increase in the base offense level more than that minimally required by the Act." 2009 Report at 30. In addition, the Commission inserted a two-level "use of a computer" enhancement in § 2G2.4, also the minimum increase permitted by SCAPA. *Id.* at 27, 32. But in a June 1996 report to Congress, the Commission expressed its view that the degree of harm caused by using a computer in child pornography offenses turns on whether such use "lead[s] to more widespread dissemination of child pornography," and that the SCAPA amendments were insufficiently "sensitive to these differences in culpability." United States Sentencing Commission, *Sex Offenses Against Children* 29 (June 1996); *see id.* at 30 ("Congress and the Commission may wish to develop a more finely-tuned system of apportioning punishment in cases involving the use of computers.").[2]

The next, and final, major overhaul of the non-production guidelines followed passage of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (Protect Act). That statute provided that "the Guidelines Manual . . . is amended

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/199606-rtc-sex-crimes-against-children/199606_RtC_SCAC.pdf.

as follows": "Section 2G2.4(b) is amended by adding" (1) a four-level enhancement if the offense involves material that portrays sadistic or masochistic conduct or other depictions of violence, and (2) a table that enhances the offense level based on the number of images involved (two levels for 10-149 images, three levels for 150-299 images, four levels for 300-599 images, and five levels for 600 or more images).  Protect Act, Pub. L. No. 108–21, § 401(i)(1)(B), 117 Stat. 650 (2003).  The Protect Act also instructed that "Section 2G2.2(b) is amended by adding" a similar image table.  *Id.* § 401(i)(1)(C).  Through these provisions, "Congress, for the first and only time to date, directly amended the [G]uidelines," rather than issuing directives that empowered the Commission to adopt amendments on its own.  2009 Report at 38.

Finally, in 2004 the Commission repealed § 2G2.4, folded possession offenses into § 2G2.2, and established new base offense levels both for possession offenses and for receipt, transport, and distribution offenses.  *Id.* at 48-49.  The Protect Act had established new five-year mandatory minimum sentences for trafficking and receipt, raised the statutory maximum for those offenses from 15 years to 20, and increased the statutory maximum for possession from five years to ten.  *Id.* at 38.  To reflect these changes, the Commission provided in the new § 2G2.2 that the base offense level for possession offenses should be 18 (up from 15 in the old § 2G2.4) and that the base offense level for transport, receipt, and distribution should be 22 (up from 17 in the old § 2G2.2).  *Id.* at 46, 48-49; *see also* U.S.S.G. App. C., amend. 664, Reason for Amendment (Nov. 1, 2004).

This background makes clear that § 2G2.2 is, "to a large extent, not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determinations on 'empirical data and national experience,' but of frequent mandatory

minimum legislation and specific congressional directives to the Commission to amend the Guidelines." *United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir. 2011) (quoting *Kimbrough*, 552 U.S. at 109); *see also United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (same); *United States v. Grober*, 624 F.3d 592, 601 (3d Cir. 2010) (same); *United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) (same) (per curiam); *United States v. McNerney*, 636 F.3d 772, 776 (6th Cir. 2011) (same); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1100-03 (N.D. Iowa 2009) (same); *United States v. R.V.*, 157 F. Supp. 3d 207, 252 (E.D.N.Y. 2016) (same); *United States v. Biddle*, No. 1:13-CR-50-TLS, 2014 WL 5089187, at *5 (N.D. Ind. Oct. 9, 2014) (same); *United States v. Hahn*, No. 8:10CR60, 2011 WL 23083, at *4 (D. Neb. Jan. 3, 2011) (same); *United States v. McElheney*, 630 F. Supp. 2d 886, 891 (E.D. Tenn. 2009) (same); *United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) (same); *United States v. Cameron*, No. 1:09-CR-00024-JAW, 2011 WL 890502, at *5-6 (D. Me. Mar. 11, 2011) (same); *United States v. Stern*, 590 F. Supp. 2d 945, 960 (N.D. Ohio 2008) (same); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W. Va. 2009) (same).

The Commission originally set the base offense level for possession offenses at 10 and created a single two-level enhancement for material involving prepubescent minors or minors under 12. But over the course of the next 15 years, at the behest of Congress, the Commission ratcheted the base offense level up to 18 and inserted multiple adjustments that significantly inflate the Guidelines range. *See Grober*, 624 F.3d at 604-05 ("It is clear . . . that the Commission was constantly reacting to Congress's repeated directives, and the penalties for child pornography offenses that were steadily, and often dramatically,

increasing."); *McElheney*, 630 F. Supp. 2d at 893 (noting "the overwhelming congressional influence in the development of the child pornography Guidelines").

The changes Congress has dictated "are not grounded in any scientific, statistical, or empirical method." *Hahn*, 2011 WL 23083, at *10.   Rather than being "based on any sort of empirical data," Congress' repeated interference with § 2G2.2 appears to be rooted in nothing more than "the general revulsion that is associated with child exploitation-related offenses." *Shipley*, 560 F. Supp. 2d at 744; *see also, e.g.*, *Beiermann*, 599 F. Supp. 2d at 1101 ("[T]he prosecution identifies not one whit of empirical analysis by the Commission supporting the repeated amendments to the child pornography guidelines at Congress's behest since 1991."); *Dorvee*, 616 F.3d at 184 n.7 ("Notably, the Sentencing Commission was neither informed nor consulted on the passage of [the changes mandated by the Protect Act], and the legislative history surrounding them offered no study or empirical justification for them.").

In particular, courts have criticized the image table mandated by Congress in the Protect Act, which adds between two and offense five levels depending on how many images a defendant possessed.  That enhancement, courts have held, is "not linked to any empirical data pertaining to sentencing and the purposes of punishment." *Biddle*, 2014 WL 5089187, at *7.  As courts have recognized, the number of images a defendant possesses often has little, if any, connection to his degree of moral blameworthiness.  Indeed, "because digital collections are generally built through trading images in Internet chat rooms, a defendant generally has very little control over the quantity of images he receives," rendering the number of images "a poor indicator of culpability." *United States v. Burns*, No. 07 CR 556, 2009 WL 3617448, at *7 (N.D. Ill. Oct. 27, 2009); *see also, e.g.*, *Hahn*, 2011 WL 23083, at

*11 (concluding number-of-images enhancement "lack[s] value as a reliable proxy for culpability"); *United States v. Jacob*, 631 F. Supp. 2d 1099, 1112 (N.D. Iowa 2009) ("The five-level enhancement for more than 600 images does not appear to be based on any empirical research that would remotely pass the *Daubert* standard for admissibility of evidence."); *Cruikshank*, 667 F. Supp. 2d at 702 ("I fail to understand how an offender with 9 images of children being sexually abused is less culpable than one with 601 such images. While both offenders have committed the same crime—the only difference being a marginal increase of demand on the market—they will have Guidelines sentences that could vary by several years.").

And like the Commission in its June 1996 report to Congress, courts have also recognized that the two-level enhancement for use of a computer lacks any empirical foundation or obvious connection to culpability. *See, e.g.*, *Biddle*, 2014 WL 5089187, at *6; *Hahn*, 2011 WL 23083, at *11; *United States v. Diaz*, 720 F. Supp. 2d 1039, 1042 (E.D. Wis. 2010) (describing enhancement as "logically flawed").

Relatedly, numerous courts have found the § 2G2.2 enhancements to be unhelpful in gauging a defendant's culpability because they "are all but inherent to the crime of conviction" and therefore "apply to the vast majority of defendants sentenced under § 2G2.2." *Dorvee*, 616 F.3d at 186; *see also, e.g.*, *Grober*, 624 F.3d at 607 ("[M]any of these enhancements apply in almost all cases."); *United States v. Riley*, 655 F. Supp. 2d 1298, 1305 (S.D. Fla. 2009) (varying downward because several § 2G2.2 enhancements "are present in virtually every case of this kind"). According to a June 2021 report by the Commission, "[f]our of the six enhancements—accounting for a combined 13 offense levels—cover conduct that has become so ubiquitous that they now apply in the vast majority of cases

sentenced under §2G2.2."   United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses* 4 (June 2021).[3]   Specifically, among defendants convicted of possession in fiscal year 2019:

- 96.3 percent received the two-level enhancement based on the age of the minors under § 2G2.2(b)(2);

- 96.3 percent received the two-level enhancement for use of a computer under § 2G2.2(b)(6);

- 95.4 percent received a two- to five-level enhancement based on the number of images under § 2G2.2(b)(7); and

- 78.6 percent received a four-level enhancement because the images depicted sadistic, masochistic, or violent conduct, or the sexual abuse of an infant or toddler, under § 2G2.2(b)(4).

*Id.* at 19.

Technological changes partially explain the ubiquity of these enhancements.  When the Commission first promulgated the computer-use enhancement in 1996, the internet was in its infancy, and so the enhancement applied to only 28 percent of defendants.  2009 Report at 30 n.148.  But in the intervening two-and-a-half decades, "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography" on the internet. *Biddle*, 2014 WL 5089187, at *6.  Today, non-production child pornography offenses occur almost exclusively online, and the internet is "the primary vehicle for delivering or consuming pornography (legal and illegal)." *Burns*, 2009 WL 3617448, at *7.  The internet, moreover, makes it "particularly easy" to amass large numbers of images with just a few clicks of the mouse. *Beiermann*, 599 F. Supp. 2d at 1105.  As a result, the number-of-images enhancement, which was "'promulgated when offenders typically received and

_____

[3] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

distributed child pornography in printed form using the United States mail,'" also applies virtually across the board. *Biddle*, 2014 WL 5089187, at \*6 (quoting United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* 313 (2009)); *see also id.* (noting computer-use and number-of-images enhancements "originally were promulgated in an earlier technological era").

The Commission's decision to treat any video as the equivalent of 75 images, *see* § 2G2.2 cmt. n.6(B)(ii), only exacerbates the problem. As the Commission itself has pointed out, the 75:1 ratio "means that a defendant with a single, relatively short, video will likely receive a 2-level increase from the application of the image table for that video." 2009 Report at 44 n.202.

And the case law's expansive interpretation of "sadistic or masochistic conduct" renders that enhancement applicable in a large percentage of cases. "[M]any circuits . . . have found that images depicting the sexual penetration of young and prepubescent children by adult males represent conduct sufficiently likely to involve pain such as to support a finding that it is inherently 'sadistic' or similarly 'violent' under the terms of section 2G2.2(b)(4)." *United States v. Hoey*, 508 F.3d 687, 691 (1st Cir. 2007) (citing cases from the Second, Fifth, Seventh, Eighth, Tenth, and Eleventh circuits). Because depictions of penetration are common in child pornography, "[t]he four-level increase for sadomasochistic conduct will also apply to most defendants." *Cameron*, 2011 WL 890502, at \*2; *see also, e.g.*, *United States v. Marshall*, 870 F. Supp. 2d 489 (N.D. Ohio 2012) ("[S]adistic and masochistic conduct is defined broadly, and applies to any image that is likely to cause physical or emotional pain—even if no evidence of such pain or cruelty exists."). And the § 2G2.2 commentary provides that the sadistic-masochistic enhancement applies "regardless

11

of whether the defendant specifically intended to possess, access with intent to view, receive, or distribute such materials." § 2G2.2 cmt. n.3. The imposition of strict liability surely increases the number of defendants subject to the enhancement.

The upshot is that many of the § 2G2.2 enhancements "apply in nearly all cases," and so the Guidelines calculations "routinely result in [ranges] near or exceeding the statutory maximum, even in run-of-the-mill cases." *Dorvee*, 616 F.3d at 186. In consequence, "adherence to the Guidelines results in virtually no distinction between the sentences" for the most and least culpable defendants. *Id.* at 187. Collapsing categories of defendants this way is, as the Second Circuit has held, "fundamentally incompatible with § 3553(a)." *Id.*; *see also Grober*, 624 F.3d at 607 (noting § 2G2.2 "do[es]not distinguish between . . . 'run-of-the-mill' offenders and the most dangerous offenders," which "is fundamentally incompatible with § 3553(a)"); *United States v. Price*, No. 09-CR-30107, 2012 WL 966971, at *11 (C.D. Ill. Mar. 21, 2012) (explaining that because § 2G2.2 "contains numerous enhancements based on facts that exist in almost every child pornography possession crime," it "results in Guideline sentences for possession crimes that do not adequately distinguish between the least and worst offenders, a result that is contrary to the requirements of § 3553(a)"); *United States v. Stieren*, No. 8:12CR423, 2013 WL 5539359, at *9 (D. Neb. Oct. 7, 2013) ("The Guidelines' sentencing scheme for child pornography crimes illogically skews sentences for 'average' defendants to the upper end of the statutory range, regardless of the particular defendant's acceptance of responsibility, criminal history, specific conduct, or degree of culpability, thus blurring distinctions between the least culpable and the worst offenders."); *Jacob*, 631 F. Supp. 2d at 1108 (same); *Marshall*, 870 F. Supp. 2d at 495 (observing that § 2G2.2 enhancements "apply to nearly every case" and thus "the

separation of serious offenders is nominal"); *Burns*, 2009 WL 3617448, at *7 ("Given their broad applicability, then, most of the enhancements provided for in § 2G2.2 are of little use in distinguishing between offenders and place most first offenders in the mine run case at or above the statutory maximum sentence."); *Diaz*, 720 F. Supp. 2d at 1042 (concluding § 2G2.2 enhancements "fail[] to distinguish serious commercial distributors of online pornography from more run-of-the-mill users"); *United States v. D.M.*, 942 F. Supp. 2d 327, 350-51 (E.D.N.Y. 2013) (concluding that in the internet era, the § 2G2.2 enhancements fail "to distinguish among offenders").

In sum, because of congressional interference and the near-universal application of various enhancements, § 2G2.2 is a "seriously flawed," *Grober*, 624 F.3d at 603, "irrational[]," and "eccentric [g]uideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results," *Dorvee*, 616 F.3d at 187-88; *see also, e.g.*, *Cameron*, 2011 WL 890502, at *6 (describing § 2G2.2 as "flawed"); *Stern*, 590 F. Supp. 2d at 960 (characterizing § 2G2.2 as "illogical"); *Henderson*, 649 F.3d at 964 (Berzon, J., concurring) (referring to § 2G2.2's "anomalous history").  And repeated congressional involvement in revising § 2G2.2 has "prevent[ed] the Sentencing Commission from performing its function of ensuring the child pornography Guidelines evolve" based on the normal, evidence-based feedback loop between courts and the Commission.  *McElheney*, 630 F. Supp. 2d at 893.

For these reasons, the Court should join the numerous other courts across the country that have varied downward from the Guidelines range in § 2G2.2 cases after finding the guideline is entitled to less deference than most.  *See, e.g.*, *Beiermann*, 599 F. Supp. 2d at 1104-06; *United States v. R.V.*, 157 F. Supp. 3d at 262-63, 266-67; *Biddle*, 2014 WL

5089187, at *8; *Hahn*, 2011 WL 23083, at *10-11; *McElheney*, 630 F. Supp. 2d at 895-96; *Shipley*, 560 F. Supp. 2d at 744; *Cameron*, 2011 WL 890502, at *6; *Stern*, 590 F. Supp. 2d at 949, 963; *Cruikshank*, 667 F. Supp. 2d at 702; *accord Dorvee*, 616 F.3d at 188 (reversing sentence as substantively unreasonable where district court did not exercise its *Kimbrough* discretion); *Grober*, 624 F.3d at 611 (affirming district court's exercise of *Kimbrough* discretion); *Huffstatler*, 571 F.3d at 623 ("[P]erhaps for good reason, the government did not take issue with Huffstatler's premise that the child-exploitation guidelines lack an empirical basis."); *Henderson*, 649 F.3d at 960 (noting, with approval, district courts' *Kimbrough* discretion to vary downward in § 2G2.2 cases); *cf. United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) ("[W]e wish to express our view that the sentencing guidelines at issue are in our judgment harsher than necessary. . . . Were we collectively sitting as the district court, we would have used our *Kimbrough* power to impose a somewhat lower sentence.").

**B.  Because the guideline for production offenses (§ 2G2.1) suffers from many of the same flaws as § 2G2.2, the Court should vary downward from the Guidelines range.**

The guideline governing child pornography production offenses, § 2G2.1, "presents some of the same problems presented by § 2G2.2." *Price*, 2012 WL 966971, at *11. In particular, § 2G2.1 does not exemplify the Sentencing Commission's "characteristic institutional role," and several of its enhancements apply in so many cases that the guideline fails to distinguish between degrees of culpability.

When the Commission promulgated the original Guidelines, it placed production offenses in § 2G2.1, which called for a base offense level of 25. U.S. Sentencing Guidelines Manual U.S.S.G. § 2G2.1 (1987). The sole adjustment in § 2G2.1 was a two-level enhancement for cases in which the victim was under 12 years of age. *Id.* Effective November 1, 1990, the Commission increased that enhancement to four levels and added a

14

two-level enhancement for cases in which the victim was between 12 and 16 years old. U.S.S.G. App. C., amend. 324 (Nov. 1, 1990). It also promulgated a new two-level enhancement that applies if "the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or if the minor was otherwise in the custody, care, or supervisory control of the defendant." *Id.* The Commission gave no explanation for either change. *See id.*

In 1995, Congress passed SCAPA, which directed the Commission to amend the Guidelines to increase the § 2G2.1 base offense level "by at least 2 levels." Sex Crimes Against Children Prevention Act of 1995, Pub. L. No. 104–71, § 2(1), 109 Stat. 774 (1995). The statute also ordered the Commission to "amend the sentencing guidelines to increase the base offense level by at least 2 levels [under § 2G2.1] if a computer was used to transmit the notice or advertisement." *Id.* § 3. The Commission responded by (1) raising § 2G2.1's base offense level from 25 to 27, the minimum increase permitted by SCAPA, and (2) adding a two-level enhancement (also the minimum increase permitted under the statute) applicable if "a computer was used to solicit participation by or with a minor in sexually explicit conduct for the purpose of producing sexually explicit material." U.S.S.G. App. C., amend. 538 (Nov. 1, 1996).

The Protect Act, enacted in 2003, increased the mandatory minimum sentence for production offenses from 10 years to 15. Protect Act, Pub. L. No. 108–21, § 103, 117 Stat. 650 (2003). In response, the Commission increased the § 2G2.1 base offense level from 27 to 32. U.S.S.G. App. C., amend. 664 (Nov. 1, 2004). At the same time, the Commission added three new adjustments: (1) a two- to four-level enhancement if the offense involved a sexual act or sexual contact, (2) a two-level enhancement if the offense involved distribution,

and (3) a four-level enhancement if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence.  *Id.*

Though not as frequently as § 2G2.2, courts have criticized § 2G2.1 for the reasons identified in *Kimbrough*: the guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role."  552 U.S. at 109.  The Commission initially set the § 2G2.1 base offense level at 25, and subsequently raised it to 32 only because SCAPA mandated a two-level increase and the Protect Act added five years to the mandatory minimum sentence.  This seven-level boost represents roughly an additional five to seven years' imprisonment for a defendant in criminal history category I, and roughly eight to ten additional years for a defendant in criminal history category VI.

Like the cocaine guideline, therefore, § 2G2.1's development was driven in large part by congressional directives and "mandatory minimum sentences," rather than "empirical data and national experience."  *Id.*; *see Price*, 2012 WL 966971, at *11 ("Section 2G2.1 is similarly not the product of empirical study by the Sentencing Commission."); *United States v. Krueger*, No. 09-CR-103, 2009 WL 4164122, at *3 (E.D. Wis. Nov. 23, 2009) ("§ 2G2.1 is not fully the product of Commission study or expertise; rather, Congress has, much like in the area of drug trafficking, significantly changed sentencing policy in this area, primarily through minimum penalty increases."); *Jacob*, 631 F. Supp. 2d at 1114 (explaining "that U.S.S.G. § 2G2.1, like U.S.S.G. § 2G2.2, was not crafted pursuant to the Sentencing Commission's nationwide empirical study of criminal sentencing, but, instead, much like policymaking in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to the Commission to change sentencing policy for sex offenses"); *Huffstatler*, 571 F.3d at 622 (accepting defendant's argument that § 2G2.1 "w[as]

16

crafted without the benefit of the Sentencing Commission's usual empirical study"); *United States v. Muzio*, 966 F.3d 61, 71 n.4 (2d Cir. 2020) (Underhill, J., dissenting) ("In my view, although perhaps not as egregiously, section 2G2.1 suffers from some of the same deficiencies as section 2G2.2 because, rather than being a product of the Commission's empirical study, Congress has driven amendments to that guideline."); *United States v. Brown*, 843 F.3d 74,  (2d Cir. 2016) (Pooler, J., dissenting) ("As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses 'usually as a result of congressional directives.'" (quoting United States Sentencing Commission, *Federal Child Pornography Offenses* 249 (2012)); *United States v. Zauner*, 688 F.3d 426, 431 (8th Cir. 2012) (Bright, J., concurring) (citing *Price* with approval in § 2G2.1 case); *United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014) ("Defendant may be correct when he says the child pornography production guideline, § 2G2.1, suffers from the same apparent defect as the distribution guideline, § 2G2.2.").

And, like the possession guideline, § 2G2.1 contains a number of enhancements that apply "in nearly every case":

> a two- or four-level enhancement in § 2G2.1(b)(1) based on the age of the minor involved; a two-level enhancement in § 2G2.1(b)(3) if the offense involved distribution; a four-level enhancement in § 2G2.1(b)(4) if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence . . . ; and the two-level increase in § 2G2.1(b)(6)(B) for use of a computer or an interactive computer service to entice the minor.

*Jacob*, 631 F. Supp. 2d at 1114.   Even the Commission recognized, when writing amendments responsive to the Protect Act, that several § 2G2.1 enhancements were "expected to apply in almost all production cases (e.g., age of the victim)."  U.S.S.G. App.

C., amend. 664, Reason for Amendment (Nov. 1, 2004); *see also Price*, 2012 WL 966971, at *11 (noting several § 2G2.1 enhancements apply "in nearly every production case, including, for example, an adjustment of 2 or 4 depending on the age of the minor involved and an adjustment of 2 for an offense involving distribution"); *Krueger*, 2009 WL 4164122, at *3 ("§ 2G2.1 contains some of the same specific enhancements as § 2G2.2, which can skew sentences upward.  Both guidelines contain significant enhancements for factors, such as images of pre-pubescent minors, present in most cases."); *Brown*, 843 F.3d at 90 n.5 (Pooler, J., dissenting) ("Where, as here, the statute applies *only* to conduct taken by an adult against a child, several enhancements purport to punish as 'distinct harms' conduct that is all but inherent in the situations and relationships necessary to give rise to the crime." (emphasis in original)).

The result is that the frequently applied enhancements "skew offense levels upward such that [§ 2G2.1] does not appropriately distinguish between the least culpable and most culpable offenders."  *Price*, 2012 WL 966971, at *11; *see also Jacob*, 631 F. Supp. 2d at 1114 (concluding § 2G2.1 "recommend[s] enhancements that d[o] not distinguish between least and worst offenders"); *Muzio*, 966 F.3d at 71 n.4 (Underhill, J., dissenting) ("[S]ome enhancements are applicable in so many cases that [§ 2G2.1] does not help distinguish between levels of culpability among defendants.").  As with § 2G2.2, § 2G2.1's failure to differentiate degrees of culpability is "fundamentally incompatible with § 3553(a)."  *See Dorvee*, 616 F.3d at 187.

A particular guideline "is likely to reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate expertise."  *Grober*, 624

F.3d at 608.  Section 2G2.1 is not such a guideline.  Because "Congress has significantly interfered with [the Commission's] efforts in this area," *Krueger*, 2009 WL 4164122, at *3, and because § 2G2.1 is a "blunt tool" that lumps unlike defendants together, *Muzio*, 966 F.3d at 71 (Underhill, J., dissenting), the Court should afford that guideline less deference than the Guidelines typically receive.

**II.    The Court should vary downward to account for two recommended adjustments—found at § 2G2.1(b)(4)(B) and § 4B1.5(b)—that effectively double-count and are otherwise conceptually unsound.**

In addition to generally viewing § 2G2.1 and § 2G2.2 with caution, the Court should vary downward to discount the increase to the Guidelines range caused by two adjustments recommended in the PSR: (1) a four-level enhancement under § 2G2.1(b)(4)(B) because Victim 2 allegedly qualifies as an "infant or toddler," and (2) a five-level adjustment under § 4B1.5(b) because Mr. Gilbert allegedly "engaged in a pattern of activity involving prohibited sexual conduct."

**A.    The "infant or toddler" enhancement under § 2G2.1(b)(4)(B)**

For count 6, the PSR recommends applying the enhancement under § 2G2.1(b)(4)(B), which adds four offense levels if "the offense involved material that portrays . . . an infant or toddler."  PSR ¶ 38.  This enhancement duplicates the § 2G2.1(b)(1) enhancement for a minor under 12 years of age—in effect, if not under a strict application of double-counting rules.

"Double counting occurs when a provision of the Guidelines is applied to increase punishment on the basis of a consideration that has been accounted for by application of another Guideline provision or by application of a statute."  *United States v. Pineda*, 770 F.3d 313, 320 (4th Cir. 2014).  Here, the PSR recommends applying not only the four-level infant-or-toddler enhancement under § 2G2.1(b)(4)(B), but also § 2G2.1(b)(1)'s four-level

enhancement for a minor under the age of 12. *See* PSR ¶ 35. These two enhancements "account[] for" the same "consideration": the young age of the victim. *Id.* And they do so in a way that inevitably punishes that consideration twice. The § 2G2.1 commentary does not define the terms "infant or toddler," but whatever those words mean, they necessarily are limited to children under the age of 12; no one would describe a twelve-year-old as either an infant or a toddler. Thus in every case where the infant-or-toddler enhancement applies, the age-12 enhancement will apply as well. It is impossible to conceive of a case in which a defendant would be subject to the § 2G2.1(b)(4)(B) infant-or-toddler enhancement, but not the § 2G2.1(b)(1) age-12 enhancement. This is textbook double-counting.

Mr. Gilbert acknowledges that "there is a presumption that double counting is proper where not expressly prohibited by the guidelines," *United States v. Hampton*, 628 F.3d 654, 664 (4th Cir. 2010), and that nothing in the Guidelines appears to prohibit applying the infant-or-toddler and age-12 enhancements simultaneously. Nevertheless, the presumption is rebutted here. The Fourth Circuit has indicated the presumption stands as long as two enhancements "address[] different aspects of [a defendant's] conduct." *Id.* But the infant-or-toddler and age-12 enhancements address the exact same aspect of Mr. Gilbert's conduct, i.e., the victim's age. There is no sound reason to add four offense levels because a victim is an infant or toddler, and then another four levels because she is also—by definition—under the age of 12. As a result, double-counting would be improper here.

And even if the normal presumption somehow applies here, the Court should vary downward by an amount equivalent to the Guidelines-range increase produced by applying the § 2G2.1(b)(4)(B) infant-or-toddler enhancement. It is fundamentally unfair to punish the

same conduct twice, regardless of whether doing so is technically permitted under the case law.

**B.    The "pattern of activity" adjustment under § 4B1.5(b)**

The PSR also recommends applying an upward adjustment under § 4B1.5.  PSR ¶ 54. That guideline has two parts.  The first increases a defendant's offense level and places him in criminal history category V if the "instant offense of conviction is a covered sex crime, § 4B1.1 (Career Offender) does not apply, and the defendant committed the instant offense of conviction subsequent to sustaining at least one sex offense conviction."  § 4B1.5(a).  The second provides that "[i]n any case in which the defendant's instant offense of conviction is a covered sex crime, neither § 4B1.1 nor [§ 4B1.5(a)] applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct," the "offense level shall be 5 plus the offense level determined under Chapters Two and Three."  § 4B1.5(b).  Because Mr. Gilbert has no "sex offense conviction[s]," he does not qualify for § 4B1.5(a).  Instead, the PSR concludes he is subject to § 4B1.5(b), which does not require a prior conviction.

Even assuming § 4B1.5(b) applies here, the Court should vary downward by an amount equivalent to the Guidelines-range increase produced by applying the enhancement.

Section 4B1.5(b) largely replicates the five-level enhancement at § 2G2.2(b)(5), which the PSR recommends applying to count 9.  PSR ¶ 48.  The latter enhancement applies if "the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor."  § 2G2.2(b)(5).  Mr. Gilbert recognizes the Fourth Circuit has held that simultaneous application of § 4B1.5(b) and § 2G2.2(b)(5) does not constitute "impermissible double-counting" because the two enhancements "promote distinct aims":

> [T]hough covering similar conduct, § 2G2.2(b)(5) and § 4B1.5(b)(1) serve distinctly different goals.  Whereas § 2G2.2(b)(5) provides an enhancement for offense-specific conduct as it relates to [a defendant's] child pornography

offenses, § 4B1.5(b)(1) is located in Chapter Four of the Guidelines under the provisions covering "Career Offenders and Criminal Livelihood." . . . That is to say, § 4B1.5(b)(1) aims not merely to punish a defendant for the specific characteristics of the offenses of conviction, as does § 2G2.2(b)(5), but to allow a district court to impose an enhanced period of incarceration because the defendant presents a continuing danger to the public.

*United States v. Dowell*, 771 F.3d 162, 170-71 (4th Cir. 2014).   Moreover, because "§ 4B1.5(b)(1) states that the five-level enhancement is to be added to the offense levels determined under Chapters Two and Three," the Fourth Circuit concluded the Guidelines "intend the cumulative application of these enhancements." *Id.* at 170.

Still, for several reasons, the Court should vary downward to discount application of § 4B1.5(b).

**First,** "[t]here is no question that [§ 4B1.5(b) and § 2G2.2(b)(5)] account for similar conduct." *Id.* at 170.  The Commission, when promulgating § 4B1.5 in 2001, conceded that it "is similar to the existing five-level pattern of activity enhancement in subsection (b)(4) of §2G2.2."  U.S.S.G. App. C., amend. 615, Reason for Amendment (Nov. 1, 2001).  As a functional matter, therefore, the two enhancements overlap to a substantial degree, such that they effectively punish defendants twice for the same conduct.  For this reason, "application of both [enhancements] . . . may not technically be 'double counting,'" but "the resulting ten-level increase . . . improperly skews upward sentences in child pornography cases, either without regard to distinctions between least and worst offenders or without regard for the proper or realistic weighting of a relevant factor in such distinctions." *Jacob*, 631 F. Supp. 2d at 1112.

**Second,** the basis the Fourth Circuit gave for distinguishing the two enhancements— that § 2G2.2(b)(5) punishes "offense-specific conduct," while § 4B1.5(b) targets general dangerousness—does not hold up.  Under the § 2G2.2 commentary, the term "'[p]attern of

activity involving the sexual abuse or exploitation of a minor' means any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, *whether or not the abuse or exploitation [] occurred during the course of the offense*." § 2G2.2 cmt. n.1 (emphasis added).  The Commission, in other words, has specifically provided that § 2G2.2(b)(5) is *not* limited to "offense-specific conduct," *Dowell*, 771 F.3d at 171, but instead can encompass conduct that was not part of "the offense."

Indeed, until 1996, the commentary defined "pattern of activity" differently, as "any combination of two or more separate instances of the sexual abuse or the sexual exploitation of a minor, whether involving the same or different victims." *See* U.S. Sentencing Guidelines Manual § 2G2.2 cmt. n.4 (1995).  At least one court of appeals interpreted this language to mean "the 'pattern of activity' enhancement [wa]s inapplicable to past sexual abuse or exploitation unrelated to the offense of conviction."  U.S.S.G. App. C., amend. 538, Reason for Amendment (Nov. 1, 1996) (citing *United States v. Chapman*, 60 F.3d 894, 901 (1st Cir. 1995)).  Effective November 1, 1996, the Commission amended the commentary to "clarif[y] that the 'pattern of activity' may include acts of sexual abuse or exploitation that were not committed during the course of the offense."  *Id.*  The amendment made § 2G2.2(b)(5) the extremely rare guideline that applies more "broad[ly] than the scope of relevant conduct typically considered under §1B1.3 (Relevant Conduct)."  *Id.*  Thus the distinction on which *Dowell* relied is illusory.

***Third,*** the recidivism rationale underlying § 4B1.5(b) is at odds with the way in which courts are directed to apply the adjustment.  According to its commentary, § 4B1.5 is meant to enhance the sentences of defendants who "present a continuing danger to the public." § 4B1.5 cmt. background.  Or, as the Commission put it when promulgating § 4B1.5, the

adjustment is "inten[ded] to punish repeat child sex offenders severely."  U.S.S.G. App. C.,
amend. 615, Reason for Amendment (Nov. 1, 2001); *see also United States v. Bastian*, 650
F. Supp. 2d 849, 870 (N.D. Iowa 2009) ("In contrast [to § 2G2.2(b)(5), § 4B1.5 was created
to address recidivism concerns."); *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005)
("[§ 4B1.5(b)] is aimed at repeat and dangerous sex offenders and is intended to aggressively
target recidivist exploiters of minors.").  But the guideline's commentary instructs that an
occasion of "prohibited sexual conduct" can be considered for § 4B1.5(b) purposes "without
regard to whether the occasion . . . resulted in a conviction for the conduct that occurred on
that occasion."  § 4B1.5 cmt. n.4(B)(ii).  That is, § 4B1.5(b) treats a defendant as a recidivist
or "repeat child sex offender[]" even if his prior instances of sexual conduct were never
discovered and did not result in criminal charges.  *See* U.S.S.G. App. C., amend. 615, Reason
for Amendment (Nov. 1, 2001) ("[§ 4B1.5(b)] does not rely on prior convictions to increase
the penalty for those who have a pattern of activity of sexual abuse or exploitation of a
minor.").

Applying a recidivist enhancement so broadly is inconsistent with the general theory
of recidivist sentencing enhancements, i.e., that someone who has reoffended *even after
being punished for a prior offense* must be incapacitated or subjected to more substantial
specific deterrence, since prior punishments were evidently insufficient to change his
conduct.  This theory is reflected in virtually every other recidivist sentencing enhancement
in federal law.  For instance, the career offender guideline, the Commission's primary tool
for punishing recidivists more harshly, requires that "the defendant ha[ve] at least two prior
*felony convictions* of either a crime of violence or a controlled substance offense."  U.S.S.G.
§ 4B1.1(a)  (emphasis added).   Likewise,  the  Armed  Career  Criminal  Act,  which  the

Commission has incorporated into § 4B1.4, applies only if a defendant "has three previous *convictions* . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another."  18 U.S.C. § 924(e)(1) (emphasis added).

The logic of predicating a recidivist enhancement on prior convictions is perhaps most evident in the federal "three-strikes law."  That statute provides, in relevant part:

> Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if--
>
> **(A)** the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of--
>
> **(i)** 2 or more serious violent felonies; or
>
> **(ii)** one or more serious violent felonies and one or more serious drug offenses; and
>
> **(B)** each serious violent felony or serious drug offense used as a basis for sentencing under this subsection, other than the first, *was committed after the defendant's conviction of the preceding serious violent felony or serious drug offense*.

18 U.S.C. § 3559 (c)(1) (emphasis added).  As the italicized language makes clear, classifying a defendant as a recidivist makes sense only if, at the time he commits an offense, he has already been prosecuted and convicted of a previous offense.  It is a defendant's failure to desist from criminal activity following conviction—not his failure to desist on his own, without ever being discovered—that is probative of whether he is likely to reoffend once released from prison on his instant conviction.  Because § 4B1.5(b) ignores this commonsense insight, it is unentitled to deference.

*Fourth,* the Commission promulgated § 4B1.5 and the accompanying commentary in error.  The guideline grew out of the Protection of Children from Sexual Predators Act of 1998 ("1998 Act").  Section 505(1) of that statute directed the Commission to

25

> review the Federal Sentencing Guidelines on aggravated sexual abuse under
> section 2241 of title 18, United States Code, sexual abuse under section 2242
> of title 18, United States Code, sexual abuse of a minor or ward under section
> 2243 of title 18, United States Code, coercion and enticement of a minor under
> section 2422(b) of title 18, United States Code, contacting a minor under
> section 2422(c) of title 18, United States Code, and transportation of minors
> and travel under section 2423 of title 18, United States Code.

Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105–314, § 505(1),

112 Stat. 2974 (1998).  Then, in § 505(2) of the 1998 Act, Congress provided that "upon

completion of the review under paragraph (1)," the Commission should "promulgate

amendments to the Federal Sentencing Guidelines to increase penalties applicable to *the*

*offenses referred to in paragraph (1)* in any case in which the defendant engaged in a pattern

of activity involving the sexual abuse or exploitation of a minor."  *Id.* § 505(2) (emphasis

added).

Under the plain language of the 1998 Act, the Commission was directed to promulgate

a pattern-of-activity adjustment for defendants convicted of "the offenses referred to in

paragraph (1)" of the act.  Those offenses were limited in number: 18 U.S.C. §§ 2241, 2242,

2243, 2422(b), 2422(c), and 2423.  The Commission noted when promulgating § 4B1.5 that

the adjustment "addresses the [1998] Act's directive to increase penalties in any case in

which the defendant engaged in a pattern of activity of sexual abuse or sexual exploitation

of a minor."  U.S.S.G. App. C., amend. 615, Reason for Amendment (Nov. 1, 2001).  Yet

the Commission did not limit application of § 4B1.5 to the offenses specifically enumerated

in § 505(1) of the 1998 Act.  Instead, the Commission applied the new adjustment to any

defendant whose "instant offense of conviction is a covered sex crime."   § 4B1.5(a), (b).

And in the commentary, the Commission defined a "covered sex crime" broadly, to include

any "offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States

Code[ or] (ii) chapter 110 of such title, not including trafficking in, receipt of, or possession

of, child pornography, or a recordkeeping offense." § 4B1.5 cmt. n.2. Mr. Gilbert's statutes of conviction, which Congress did not include in § 505(1) of the 1998 Act, appear in Chapter 110 of Title 18. *See* 18 U.S.C. §§ 2251(a), 2252A.

Guidelines commentary "is authoritative and controlling unless it 1) violates the Constitution or a federal statute; 2) is inconsistent with the Guidelines; or 3) constitutes a plainly erroneous reading of the Guidelines." *United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018). Here, the § 4B1.5 commentary's definition of "covered sex crime" "violates . . . a federal statute," *id.*, namely, the 1998 Act, which directed the Commission to promulgate a pattern-of-activity only for the crimes enumerated in § 505(1) of that act. *See United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019) ("Under the *expressio unius* canon, expressing one item of an associated group or series excludes another left unmentioned."). The Court should therefore ignore that definition and either decline to apply § 4B1.5(b) or vary downward.

*Fifth,* § 4B1.5, like the child pornography guidelines, "do[es] not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. Under the guideline as originally written, a defendant engaged in a "pattern of activity involving prohibited sexual conduct" only if "there were at least two minor victims of the prohibited sexual conduct." *See* U.S. Sentencing Guidelines Manual U.S.S.G. § 4B1.5 cmt. n.4(B)(i)(II) (2002). In the Protect Act, however, Congress provided that "Application Note 4(b)(i) to section 4B1.5 is amended" to remove the multiple-victim requirement. Protect Act, Pub. L. No. 108–21, § 401(i)(A), 117 Stat. 650 (2003). The current guideline therefore applies as long as, "on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor," regardless of whether the minors on those occasions were

separate people.  § 4B1.5 cmt. n.4(B)(i) (2021).   The § 4B1.5 commentary reflects this change, noting that "Section 401(i)(1)(A) of [the Protect Act] directly amended Application Note 4(b)(i)." *Id.* cmt. n. background.  Thus in writing § 4B1.5, the Commission was unable to "provide[] some insulation from the distorting pressures of politics," as it was intended to.  *See Zauner*, 688 F.3d at 430 (Bright, J., concurring).   As far as counsel are aware, Congress has never, in any other context, directly amended the commentary to a guideline. *See* 2009 Report at 38 (noting that, as of 2009, the Protect Act represented "the first and only time to date" that Congress had "directly amended the guidelines").  This unprecedented interference with the Commission's work disentitles § 4B1.5 to the solicitude that courts normally afford the Guidelines.


Respectfully submitted,

JAMES WYDA
Federal Public Defender


_____/s/_____
ELIZABETH G. OYER
CULLEN O. MACBETH
Office of the Federal Public Defender
100 S. Charles Street, Tower II, Ninth floor
Baltimore, MD 21201
Telephone: (410) 962-3962
Facsimile:  (410) 962-3976
Liz_Oyer@fd.org
Cullen_Macbeth@fd.org