IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
     v.                             )   Case No. 8:20-cr-00374-PWG-1
                                    )
BRIAN ANTHONY GILBERT,              )
                                    )
                  Defendant.        )
_____)

                              Greenbelt, Maryland
                              December 8, 2021
                              9:37 a.m.


                     <u>SENTENCING HEARING</u>

           BEFORE THE HONORABLE PAUL W. GRIMM



                  <u>A P P E A R A N C E S</u>

<u>On Behalf of the Government</u>:

     OFFICE OF THE UNITED STATES ATTORNEY
     DISTRICT OF MARYLAND
     6500 Cherrywood Lane, Suite 200
     Greenbelt, Maryland  20770
     BY:  JOSEPH RONALD BALDWIN, ASSISTANT U.S. ATTORNEY
          (301) 344-4238
          joseph.baldwin@usdoj.gov

     U.S. DEPARTMENT OF JUSTICE
     1301 New York Avenue, N.W., 11th Floor
     Washington, D.C.  20005
     BY:  ALICIA A. BOVE, ASSISTANT U.S. ATTORNEY
          (202) 699-1134
          alicia.bove@usdoj.gov



                        (Continued)

1        <u>A P P E A R A N C E S</u> (Cont'd)

2   <u>On Behalf of the Defendant</u>:

3        OFFICE OF THE FEDERAL PUBLIC DEFENDER
         100 S. Charles Street
4        Tower II, 9th Floor
         Baltimore, Maryland  21201
5        BY:  ELIZABETH GENEVIEVE OYER
                ASSISTANT FEDERAL PUBLIC DEFENDER
6               (410) 962-3962
                liz_oyer@fd.org
7        BY:  CULLEN MACBETH, ASSISTANT FEDERAL PUBLIC DEFENDER
                (410) 962-3962
8               cullen_macbeth@fd.org

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                   PATRICIA KLEPP, RMR
                     Official Court Reporter
24          6500 Cherrywood Lane, Suite 200
                 Greenbelt, Maryland  20770
25                     (301) 344-3228

1          P R O C E E D I N G S

2          (Call to order of the Court.)

3              THE COURTROOM DEPUTY:  May I have your attention,

4     please.  The United States District Court for the District of

5     Maryland is now in session, the Honorable Paul W. Grimm

6     presiding.

7              THE COURT:  Good morning.

8              MS. OYER:  Good morning, Your Honor.

9              MR. BALDWIN:  Good morning, Your Honor.

10             THE COURT:  The matter now pending before this Court

11    is Criminal No. PWG-20-374, United States of America v. Brian

12    Anthony Gilbert.  We're here today for the purpose of

13    sentencing.  Counsel, please identify yourself for the record.

14             MR. BALDWIN:  Good morning, Your Honor.  Joseph

15    Baldwin for United States, also Alicia Bove from the Child

16    Exploitation Obscenity Section, who will be providing

17    government's argument today, and we have some interested parties

18    also in the courtroom today.  Thank you, Your Honor.

19             THE COURT:  Understood.  Thank you.  And for the

20    defendant?

21             MS. OYER:  Good morning, Your Honor, Liz Oyer and

22    Cullen Macbeth for Brian Gilbert, who's present to my right.

23             THE COURT:  Thank you very much.  Let me just review

24    the Court's COVID policy for everyone.  The requirement is that

25    everyone in the Court must wear a mask.  Those who speak, the

1  lawyers and the parties, if they wish to be heard, or any

2  victims who wish to be heard, may remove a mask if they have

3  been vaccinated and it's been more than two weeks since their

4  last vaccine and they're feeling well.

5  So I just want to provide that to everybody so that we

6  know what the current status is, because the Court's procedures

7  have, over time, changed somewhat, given the changes in the

8  status of the pandemic.

9  In addition, Counsel, it's probably easier if you just

10  remain seated, if you are able to resist the urge to stand,

11  because when you stand, you get away from the microphone, it's

12  hard to hear, and so if you could just do that, it would

13  probably work better.  I am going to remove my mask because I

14  have been vaccinated, and it does make it a lot easier for

15  people to hear.

16  Procedurally, let me just sort of recap where we are

17  in this case.  Mr. Gilbert entered a plea in September of this

18  year to three counts:  Count Three, which was production of

19  child pornography under 18 U.S. Code 2251, for which there's a

20  mandatory minimum period of imprisonment of 15 to a maximum of

21  30 years imprisonment; of Count Six, production of child

22  pornography, with the same mandatory minimum and maximum; and

23  Count Nine, possession of child pornography under 18 U.S. Code

24  2252A, which has no mandatory minimum but a 20-year maximum.

25  A presentence investigation report was initially

prepared on October 13th and revised on November 2nd, and the important thing to keep in mind was that in this plea, the defendant reserved the right to object to a number of the enhancements that apply in this particular case, and that was preserved in the plea agreement itself, which was at ECF 32.

When the submissions were prepared -- and we have ECF No. 40 and ECF No. 42 from counsel for the defendant -- the defendant approached from a bit different direction, the defendant's concerns about the sentencing guidelines that apply in cases such as this. So instead of objecting to the guidelines applications and requiring what could be an extended discussion of those before the Court calculated the guidelines, the defendant noted the objection but also submitted an extensive sentencing guidelines objections, which -- all of which I have carefully read, as well as a comprehensive sentencing memorandum with many exhibits, all of which I have read.

The government also submitted an extensive sentencing memorandum at ECF 44, as well as a series of filings that dealt with information from victims, not only the individual minors who were the subject of the facts of this particular case, but also others whose images have appeared in some of the child pornography that was found on the digital devices of the defendant when they were seized and searched.

Yesterday, the government filed some additional

documents.  One was at ECF 46, in which it advised that the

government has found that images of the two minor victims in

this case have been found circulating among child pornography

offender sites, as well as some victim impact statements in a

letter from the mother of one of the victims, all of which I

have reviewed as well.

I am -- I'm interpreting -- Ms. Oyer, perhaps you can

tell me if you disagree with that -- your objections to the

guidelines as being in conjunction with the sentencing

memorandum in support of a motion for a variant sentence.

MS. OYER:  That's correct, Your Honor.

THE COURT:  As opposed to going through enhancement by

enhancement, because you cover the same territory in doing that

towards an objective which I think is the ultimate objective of

what you were filing.

MS. OYER:  That's correct, Your Honor.

THE COURT:  All right.  So let me start with the

guidelines here in this case.  I want to thank Mr. Lowe for his

hard work on this, and I adopt his findings of his guidelines in

the presentence report and adopt them as my own.

The offense level for all three counts come to a 43

when you add everything up and then cap it out at the maximum

guidelines range, because it would otherwise be 51 reduced to

43, and there's no dispute that Mr. Gilbert's criminal history

category is a I, and that applies for all three.  If you have a

43-I, the guidelines themselves would say that regardless of

whether it's Category I up to Category VI, it's a -- life

imprisonment is the guidelines recommendation, but that is not

possible here because of the statutory maximums that are

involved.

And through the result of the calculation of the

guidelines, what it amounts to is a guidelines total sentence

recommendation of 960 months, which is 80 years, and that is a

function of the statutory maximums as well as the reduction of

the guidelines down to 43, which is as high as they go from the

51.

So it would be 96 months, because of the sentencing

max, for each count, with the exception of the final count,

which would have to be 240 months maximum, because that's the

maximum statute.  So it boils down to 360 months for the

first -- Count Three and Six, and then 240 months for Count

Nine, five years to lifetime supervised release, a fine of

between $50,000 and $250,000, and a special assessment of $100

times three, as well as the special assessments of -- the

additional special assessment of $5,000 per count on any

non-indigent person convicted of these offenses, as well as

another enhancement of $17,000 for any person convicted of 18

U.S. Code 2252A(4) or 2252A(1) or A(a)(5), and not more than

$35,000 in any person convicted of any other offense for

trafficking, and not more than $50,000.

1          So there are these additional mandatory special

2     assessments.  I'll ask more about that later to find out what

3     the government believes, and some of these are maximums rather

4     than a specific amount, but those are the guidelines

5     calculations.

6          Anybody want to be heard on that before we go further?

7          MS. BOVE:  No, Your Honor.

8          MS. OYER:  At some point, Your Honor, Mr. Macbeth

9     would like to address the policy arguments related to the

10    guidelines, but as to the calculations, we have nothing to add.

11         THE COURT:  Right.  I think we'll handle that as part

12    of the presentation on -- I want to hear if there are any

13    victims that want to be heard, I want to hear the government's

14    presentation, then turn it over to you, and between you and

15    Mr. Macbeth, you can allocate it however you wish to do so.

16         MS. OYER:  Thank you, Your Honor.

17         THE COURT:  And I think that's probably the easy way

18    to do it.

19         Ms. Bove, I know that you submitted a lot of witness

20    impact statements of the -- what I would call historical

21    victims, as well as the information from the victims in this

22    particular offense.  Are there any people who have indicated

23    that they wish to be heard in person here today?  If that's the

24    case, I do want to cover that first.

25         MS. BOVE:  Thank you, Your Honor.  No, not at this

1  time.

2          THE COURT:  Okay, thank you.  Then I'm happy to hear

3  your presentation, ma'am.

4          MS. BOVE:  Your Honor, the defendant, a 33-year-old

5  man at the time of the abuse, orally raped a toddler, a

6  2-year-old.  That wasn't enough for him.  He videotaped it.

7  Orally raped a 5-year-old.  Wasn't enough for him.  Videotaped

8  that.  These videotapes weren't enough for him.  He uploaded

9  them to the dark web, bragged about it, told others to "Enjoy

10  it."  Said he was going to make "A series of his abuse of

11  Victim 1."  He had plans for her.

12          The defendant engaged in graphic sexual acts.  He

13  videotaped that.  He made six videos of his monstrous abuse, six

14  videos in two years, the contents of which are detailed in the

15  PSR, Pages 7 and 8.  He told us, we have his words, he wished he

16  could have done more, wished he could have made more.  And this

17  is a quote.  "It's just I'm limited to what I could do with her

18  when she's around.  I do not have my own place, and with this

19  COVID shit, it makes it tougher."

20          The defendant made six videos in two years of his

21  heinous sexual abuse of these children during a global pandemic

22  while living with his parents and while others were around.

23  Wasn't enough for the defendant to sexually abuse these

24  children, wasn't enough for him to videotape that abuse for him

25  to watch it himself, but he had to upload those videos to the

dark web, for other child sexual predators to consume in perpetuity. And consume they have, Your Honor. As Your Honor indicated, we've seen these images now being circulated in several states, in several different investigations. There is no way for us to get those images back.

The defendant has sentenced these children to a lifetime of trauma, victimization, and revictimization. And he did that knowing the risks. And how do we know he knew the risks, Your Honor? He told us. He said, and I quote, "We all know people who produce CP are mostly the targets. I already started the clock."

He tells this Court he only deserves 20 years in prison. We can't offer these children a 20-year sentence. We can't tell them in 20 years, the videos of their most vulnerable and violated moments will be gone. Can't tell them the trauma that they carry from the abuse at the hands of the defendant will be gone. Can't do that.

And how we know we can't do that? Well, there are plenty of studies that have tracked victims of child sexual abuse over the years, and we see those signs of trauma in our own victims. We've cited those in our submission, and we've seen in this case, Victim 1 is presenting with hypersexualized behavior, disengagement, concentration issues. Victim 2 has abandonment Issues. Only four years old.

But we don't only have to rely on those studies,

Your Honor, we don't only have to rely on what Victims 1 and 2

have already reported to this Court.  We have the other victim

statements, the children that are depicted in the thousands of

child sexual abuse material that were found on the defendant's

devices, images including sadistic and masochistic abuse of

children.  Those victims detail for this Court the daily

hellscape that they are trapped in, knowing that their abuse

lives forever on the internet and is constantly being

voraciously consumed by predators like this defendant.

In the face of all of this, the defendant uses his

submission to the Court to say he's a family man, who's nice.

These same features are those which got him access to children

unsupervised, being a family man and nice, that allowed his

abuse to go unnoticed for two years, that allowed him to

download thousands of child sexual abuse material images,

unnoticed.

The defendant claims he needed and was seeking help,

but his own words and actions belie him.  We are seeing in the

defendant patterns, technique, textbook techniques of grooming.

He's showing these victims child sexual abuse material, showing

them what he's going to do to them.  And we have his words.  And

this is a quote again:  "I uploaded two videos, one video as

late as last year and second one was earlier this year, if

that's what you're asking.  So far, only those three videos I

had uploaded of me and Victim 1.  If you want the links, I'll

post them, but yeah, I'm naming this series.  Well, producing CP, child pornography, ain't easy, mate.  I would have uploaded more, but battery was dying and the younger child had it, so I couldn't record anymore.  We did do more, but sadly, couldn't get all that action I wanted to record."

These are not the words and actions of somebody seeking help.  And again, the defendant attempts to paint himself as a nice guy through the submission of a psychosexual evaluation.  Notably, however, although the report details the defendant is indeed a pedophile, one who has been sexually interested in children for decades, the defendant's own expert does not expressly opine on the defendant's risk of recidivism but does implicitly opine on the defendant's risk of reoffending.

On Page 15 of Mr. Lane's report, he states that, "Mr. Gilbert should not have any caretaking responsibility or unsupervised contact with a minor."  The defendant is a risk to children, and even if the defendant were ever to get out of prison, his own expert acknowledges he will continue to be a risk to children.

We are recommending a serious sentence here, Your Honor, because the crime is serious, the defendant's characteristics and history are serious, and the need to deter and promote respect for the law are serious.

The defendant will point to the fact that he's a

pedophile, that he was fighting these urges.  Time and time again, we can look back in this fact pattern and see, these were voluntary decisions, of escalation of abuse, videotape upload, abuse videotape upload.  These are decisions, over and over again.

Finally, Your Honor, we are recommending that -- the restitution breakdown in our submission on Page 26, plus the restitution sought in Victim 1's submission, in lieu of any fine.

For these reasons, Your Honor, and those laid out in our position paper, the United States submits that a sentence of 960 months reasonably and appropriately accounts for the sentencing factors and is sufficient, but not greater than necessary, to achieve the goals of sentencing.

THE COURT:  The restitution that you have sought in the chart that you have provided, has that been discussed with the defendant and agreed upon?

MS. BOVE:  It has been discussed, Your Honor; it has not been agreed to.

THE COURT:  All right.  Well, I'm not going to -- I will order restitution, but I think I'm obligated to have a hearing on that if it's not been agreed to.  This is probably not the time to do that, because I want to have people have the opportunity to be prepared for that, but we'll set a deadline within which we will schedule and have that restitution hearing.

1          All right.  Thank you.

2          Ms. Oyer, however you want to organize this, I'm happy

3    to hear from you and/or Mr. Macbeth.

4          MS. OYER:  Thank you, Your Honor.  I'll let

5    Mr. Macbeth begin by talking about the guidelines, and then I'll

6    address the remaining 3553(a) factors.  Thank you.

7          THE COURT:  Thank you.

8          MR. MACBETH:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10          MR. MACBETH:  I'd like to just start by making a

11    couple of points about two specific guideline provisions that we

12    talked about in our papers.

13          The first is the enhancement under 2G2.1(b)(4) for

14    material that involved an infant or toddler.  And although we

15    didn't lodge a formal objection to the enhancement, we do think

16    that this enhancement essentially replicates another enhancement

17    that applies to the same count, which is the enhancement for

18    someone under the age of 12.  Any infant or toddler is going to

19    be under the age of 12, and so anytime the infant or toddler

20    enhancement applies, the age 12 enhancement will apply as well.

21    And whether or not this is technically double-counting under the

22    guidelines, it essentially punishes the same conduct twice.

23          And so our view is that whether the Court simply

24    doesn't apply it or varies down, the Court should discount that

25    enhancement because it is just -- it's covering the same conduct

twice.  It would be sort of like in a fraud case, if a defendant were at the top of the loss table, it would be like applying the top level for the loss table as well as every level below it because you're covering, you know, escalating or increasing age ranges or loss amounts.  It's repeating that same conduct.

Similarly, with respect to the 4B1.5 pattern of activity enhancement, our view is that that also replicates the enhancement at 2G2.2(b)(5).  And we're aware that the Fourth Circuit has said that those are not technically double-counting, so again, we're really phrasing this request as a variance, but for all intents and purposes, those two adjustments cover the same conduct.  The commentary to both guidelines expressly says that they apply, regardless of whether the sexual conduct occurred during the course of the offense. Commentaries to both guidelines says -- explicitly says it applies regardless of whether the conduct led to a conviction.

The 2G2.2 commentary explicitly says it applies regardless of whether there's one victim or two victims, and the commentary to 4B1.5 also applies, regardless of whether there's one or more victims after Congress explicitly amended the commentary in the PROTECT Act.

So, you know, regardless of, again, whether those two adjustments are technically double-counting, we think they cover the same conduct, and so adding five levels twice would be unfair.  And as we said in our objections to the guidelines, we

think there are also other problems with the 4B1.5 adjustment

specifically, and I won't repeat all of those here, but just two

points briefly.

One is that the 4B1.5 adjustment was promulgated in

response to a congressional directive, a statute passed in 1998,

the Protection of Children From Sexual Predators Act, and that

statute specifically directed the Commission to promulgate an

adjustment for certain enumerated offenses that were

specifically listed in the statute.  But when the Commission

wrote 4B1.5, it did not limit application of that enhancement --

or adjustment, I'm sorry, to those statutes; it instead applied

the adjustment to any covered sex crime, which is a much broader

term.

And Mr. Gilbert, while he has been convicted of a

covered sex crime, has not been convicted of any of the crimes

enumerated in the 1998 Act.  So we think that the commentary is

inconsistent with the Act for that reason and so, therefore, not

binding on the Court.

And more broadly, as we said in our memo, we think the

theory of 4B1.5 is inconsistent with the general theory of

recidivist enhancements, which is that when someone has

committed an offense, been caught, and been punished, and still

commits another offense, increased punishment is in order

because that person clearly is not amenable to deterrence or

rehabilitation.  But 4B1.5 and 2G2.2 don't use that theory,

because they don't require that a defendant have been convicted
of a previous offense.

And as we said in our papers, I think it's true that
essentially every other enhancement, at least that I'm aware of
in federal law for recidivism, requires a prior conviction,
because that's what's relevant when assessing whether previous
conduct makes someone deterrable in the future, and 4B1.5 simply
doesn't have that limit on it.

So for those reasons, we'd ask the Court to vary down
by 5 levels, which would be the equivalent of not applying
4B1.5.  And again, while we are not formally objecting to the
application, I just want to note that if the Court agreed with
us about the infant or toddler enhancement being duplicative and
the 4B1.5 adjustment being duplicative, then Mr. Gilbert's
adjusted offense level after grouping would be a 45, and then,
following a three-level reduction for acceptance of
responsibility, he would be a 42, which would bring the
guidelines range at a 42 and Criminal History Category I to 360
to life instead of life.

And then, for the reasons that we discuss in our memo,
we think that from there, there are -- there's good reason to
treat the child pornography guidelines with less deference than
the Court treats most guidelines.  And specifically, as the
Supreme Court said in its opinion in *Kimbrough v. United States*,
the reason that as a general matter the guidelines are entitled

to deference is that they result from this empirical

back-and-forth, give-and-take between the Commission and Courts,

where Courts apply the guidelines, provide commentary on them,

the Commission looks at that data, it talks to prosecutors and

defense attorneys, it incorporates the feedback and amends the

guidelines accordingly.  And the child pornography guidelines do

not result from that process; they are, to a large extent,

driven by congressional directives.

And I won't go through it all here, but the production

guideline, for instance, the Commission initially set the base

offense level at 25 for that offense, which is already quite

high, and eventually raised it to 32, based on directives from

Congress, not because of this empirical institutional role that

the Commission usually plays.

And relatedly, some of these enhancements, some of

which are also the result of congressional directives, apply in,

you know, large percentages of cases, with the result that they

don't meaningfully differentiate between the least and most

serious offenders, and so defendants very frequently end up at

or near the statutory maximum under the guidelines.

And the whole purpose of 3553(a) is to provide a basis

for distinguishing between more and less serious offenders, and

so courts have recognized, like the Dorvee Court in the Second

Circuit and the Grober Court in the Third Circuit, that this --

the resulting scheme is "fundamentally incompatible with 3553(a)

because it bunches defendants together without providing the basis for distinguishing them."

So I'm happy to answer any questions the Court has, but in general, our view is that these guidelines are -- have been distorted by the -- I don't want to use the word "interference," but involvement of Congress, which has meant that the Commission, the Sentencing Commission has not been able to perform the role it typically performs when writing the guidelines.

THE COURT: All right, thank you. I appreciate that, and I'm very familiar with the body of literature that has accumulated discussing the issues that you have raised here with regard to the guidelines in these kinds of cases.

Ms. Oyer, before I hear from you, I'm going to ask everybody just to stay where they are. I left a notepad that has some notes on it on my desk, I want to go get that, so I'm just going to get up and go get the notepad and come back. Don't anybody stand; we're not really taking a recess, I'm just going to go grab that, it'll take two seconds. I'll be right back.

(Pause.)

THE COURT: All right. Thank you all. Ms. Oyer.

MS. OYER: Thank you, your Honor. It would be very easy to read the government's sentencing memo and have listened to the government's presentation and conclude that Mr. Gilbert

must be a monster, because who would do these things to

children, who are vulnerable and need our protection?  But

Your Honor, it is truly not that simple, and I believe the Court

has handled enough of these cases to know, as I have, that these

cases are very complex because they deal with an innate

condition that some human beings have, for reasons that we don't

fully understand, that drive them to do things that are

intolerable in our society.  And these are often, like

Mr. Gilbert, people who are otherwise law abiding, upstanding

citizens who have never committed a crime before and who have

lived on the right side of the law.

And these are often people like Mr. Gilbert, who have

families who love them and care about them.  Mr. Gilbert's

mother, and father, and his older brother are present in court

today, and they're standing by him because the side of him that

they know and have known for the 34 years of his life is very

different from the one that he expressed in the context of these

charges.

And Your Honor, it's very different from the side of

him that I see when I visit with him regularly during the course

of this case.  He's a soft-spoken, mild-mannered person who, in

many respects, comes across as nice.  The prosecutor disparages

the description of him as being a nice person, and I understand

that, based on what he's done, but there is just a different

side of him, other than the one that the Court is looking at

1   when reading the government's sentencing memorandum and the

2   allegations as to what he did here.

3        And your Honor, I want to acknowledge that the harm to

4   the victims in this case that the government has outlined in

5   their memo is real.  It is a real and long-lasting harm, and

6   nothing is ever going to make them whole again, and that

7   includes sentencing Mr. Gilbert to effectively the rest of his

8   natural life in prison.

9        Your Honor, emotionally, what may be easiest to do

10   here and what understandably the victims want to see here is to

11   incarcerate Mr. Gilbert for the maximum allowed under law, which

12   in this case is 80 years, which is the rest of his natural life.

13   But Your Honor, that's not -- it's not actually necessary to do

14   that to protect society or these victims.  It's not helpful in

15   addressing the problem of pedophilia generally or in the case of

16   Mr. Gilbert specifically, and it's just not proportional to the

17   offense.

18        I want to ask the Court to consider what motivated

19   Mr. Gilbert to act in the way he did here.  There's a lot of

20   scientific evidence.  There's, I would say, at this point, a

21   scientific consensus that pedophilia is an innate characteristic

22   that some people are born with for reasons we don't fully

23   understand.  It is not a choice.  Nobody wants to be a pedophile

24   or chooses to be a pedophile; it's simply something that some

25   people like Mr. Gilbert are born with and struggle with

1  throughout their lives, and I don't dispute that the decision to

2  act on the pedophilic impulses is a voluntary one, but it's a

3  voluntary one that is the product of very strong urges that are

4  very difficult for someone like Mr. Gilbert to control without

5  any help or support, and Your Honor, I think that the scientific

6  community agrees that this is a condition that is treatable and

7  can be addressed in better ways than incarceration.

8       And most cases that Your Honor sees in this Court, the

9  criminal offense is motivated perhaps by greed, in the case of a

10  financial fraud, or perhaps by some general depravity or

11  disregard for others, or some malice toward other individuals in

12  the case of some violent crimes.

13       But this is a case in which Mr. Gilbert acted on an

14  uncontrollable impulse, he didn't want to have this condition

15  that led him to act in the way he did, and I want to ask the

16  Court to take that into account in sentencing him.

17       There is a lot of -- well, there's a tendency,

18  sometimes, in these cases to impose sentences that are based on

19  the general condemnation of this type of behavior.  It disgusts

20  people, it repulses people, for good reason, but there is a

21  whole body of evidence and -- there's a whole body of science

22  that indicates that there are better ways to address people like

23  Mr. Gilbert.

24       The approach that the government is proposing is

25  essentially to lock him up for life and throw away the key, and

1    that is not actually a solution, Your Honor.  It is a reality

2    that people like Mr. Gilbert, who have pedophilia, are a part of

3    our society, and we are never going to reduce the danger that

4    people like Mr. Gilbert can pose to children unless we start to

5    deal with that fact in an evidence-based, science-based way,

6    rather than based on emotion, and stigma, and shaming.

7            This is not just for the benefit of people like

8    Mr. Gilbert, but it's for the protection of children.  When

9    people like Mr. Gilbert are marginalized and pushed to the edges

10   of our society and feel like they can't get help because there

11   is so much shame associated with their condition, that endangers

12   more children, and that does nothing to ultimately solve the

13   problem that is posed by the presence of pedophiles in our

14   society.

15           Your Honor, we've cited a lot of literature in our

16   sentencing memo that indicates that the condition that

17   Mr. Gilbert has is a treatable disorder and that with

18   appropriate treatment, the chances of recidivism are much, much

19   lower than they would be otherwise.  There's also an

20   increasingly voluminous body of research that shows that the

21   idea that pedophiles are destined to reoffend is really not

22   true.  The evidence of recidivism is actually much lower than

23   the common myth associated with this type of offense.

24           And I want to note, Your Honor, also, that Dr. Lane,

25   who evaluated Mr. Gilbert, has noted a number of factors that

make him a very good candidate for treatment, including the fact

that he has the amenability and willingness and interest in

treatment, he's got the support of the family, and he's got the

level of cognitive functioning that would make him receptive to

learning from treatment.

So your Honor, I just want to underscore that I really

don't actually disagree with anything the government has said in

their presentation other than what is the appropriate solution

in a case like this and how do we appropriately approach a case

where an individual has done real and lasting harm to victims

that cannot be undone, and that individual acted out of a

condition that is innate, and beyond their control, to some

extent, and also treatable.

And Your Honor, I think that the appropriate solution

is a lengthy sentence of incarceration that punishes that

conduct and that allows for the opportunity for treatment, and I

would submit that in the case of a 34-year-old man like

Mr. Gilbert, 20 years is a very, very lengthy sentence of

incarceration. But your Honor, Mr. Gilbert should have a chance

at having a life, after he serves that time and after he gets

treatment, back in society.

And this case certainly indisputably calls for a

lifetime of supervised release following the end of the

sentence, and during that term of supervised release,

Mr. Gilbert will have the benefit of receiving continued

1    treatment in the community, he will be monitored by probation,

2    he will undoubtedly have restrictions on his ability to access

3    the internet and do things that would facilitate the type of

4    conduct that happened here, and Your Honor, if he violates any

5    conditions, including what we maybe call the technical ones, he

6    can be sent back to prison by Your Honor or another judge of

7    this court at any time.

8            So I believe, Your Honor, that the proportional

9    response to what Mr. Gilbert did here and the response that

10   appropriately situates individuals with pedophilic disorder in

11   our society is one of imprisonment followed by supervised

12   release, not a lock the door and throw away the key type

13   approach, which is what the government is proposing here.

14           THE COURT:  Thank you, ma'am.

15           You have provided a significant amount of information

16   in connection with your filing, all of which I have looked at,

17   and I will have some comments on that in just a bit.

18           Does Mr. Gilbert wish to say anything?  If so, I'd

19   like to give him the opportunity to do it.  If he chooses not

20   to, there will be no adverse inference, but obviously, if he

21   chooses to say something, then I will be happy to hear anything

22   he has to say.

23           MS. OYER:  I believe that he does wish to address the

24   Court, Your Honor.

25           THE COURT:  All right.  He can remain seated, if he

1    wishes to do so.

2            MS. OYER:  Your Honor, could I have just a moment?

3            THE COURT:  Of course.

4            MS. OYER:  Thank you.

5        (Conference between Ms. Oyer and Defendant.)

6            THE DEFENDANT:  Hello.  Do you hear me?

7            THE COURT:  I can hear you, sir.

8            THE DEFENDANT:  Yeah.  I'd like to apologize today for

9    my actions, and what I've done wasn't right.  I was dealing with

10   a lot of mental issues for a while and stuff over the years, and

11   a lot of people saw the chance of me acting differently, and

12   they kept saying, Do you need any help?  And I said, Why?  And

13   they said, Because you be acting kind of strange lately; you be

14   having these off and on moods.

15           And at the time, I don't even recognized that I'd be

16   having these off-and-on moods.  It was like my older brother,

17   one day he saw me get mad, then all of a sudden, I'd come back

18   to being nice.  And he looked at me and said, Do you know what

19   you just did?  I said, No.  And he said, You just had one of

20   your episodes.  I said, I did?  So, what did I do?  And he said,

21   You just like -- you just about to punch the computer, and then

22   you just went back to being happy.  I said, I don't recall doing

23   that.

24           And then, over the years, I be hearing things and

25   seeing things.  And sometimes I get up in the middle of the

night and I look at my mother, I say, Did you just call my name?
And she said, No, I never call you.  I said, Well, who called my
name, then?

          And then, sometimes, people saying, Do you hear me
calling you?  I said, No, I don't hear you calling my name.  So
sometimes, I hear people calling my name and sometimes I don't,
and it's like off and on.  And then, sometimes, I see stuff,
like the other night, and I had one of my episodes or some image
of my bunk bed.  He's sitting on the ground -- floor, and I
looked down at him.  I don't know if I was awake or asleep when
it happened.  And I looked on the floor, and I saw him sitting
on the floor.  I said, Is that you?  I didn't -- I know it
wasn't him, because he turned around and looked at me, and he
had like a -- this big a face, and he looked at me, and he
jumped on the bottom of the bunk bed, and I looked down at him
and he was asleep.  So I was like, okay, well, he's still
asleep; what did I just saw?

          And it happened off and on; I keep seeing things I
can't explain, I keep hearing things I can't explain.  And then,
what they said, da- -- I'm like, a da- -- I ain't -- I'm not no
danger to the community because I mostly decided to keep to
myself at daytime, so I sleep during the day, because at night,
I have very bad problems at night; I can't really explain what I
be doing at nighttime because I'd be slipping in and out of
these I'm-awake states or half-sleep states.  It's like a mental

1   thing going on; I can't really explain it.  So I don't know when

2   this whole thing started, but it was something, man, it was --

3   maybe around 2000-something, I don't know.  I -- sometimes, I

4   can't really keep track of all the in-and-outs.

5           Okay.  And what -- and I wouldn't even be here, but I

6   want to say one more thing.  I'm sorry that what I done was

7   wrong, and I wish I could take it back, but at the end of the

8   day, people like me, you know, we just all -- you know, a chance

9   to redeem ourselves, you know, we do, because some of us really

10  do have problems and some of us do want to get the help that we

11  need, because I do -- I'll tell you the truth, some of the

12  inmates found out what I'd done.  They say, you know what,

13  you're not a bad person; we forgive you because we got to know

14  you.  You're a good person, we want you to get the help that you

15  need, we want you to go home to see your family, get the help

16  that you need.

17          Because I see the difference; some people with the

18  same problems as me got treated different than me.  The other

19  inmates don't want to deal with those people.  They say, well,

20  those type of people, we don't want to deal with, because we

21  know for a fact they don't want to change, but we did with you

22  because we know for a fact that you can change because we got to

23  know you.  And that meant a lot to me, you know?

24          So, yeah, that's all I got to say for now, mm-hmm.

25          THE COURT:  All right, sir, thank you.

1    I want to address the fine part before I make my
2 comments, and my comments will be in two separate sections.  One
3 will be addressing the guidelines issue, and then the second
4 part will be my analysis under Section 3553.  But I understand,
5 these are all subject to ability to pay, and I think it's pretty
6 clear that if there's to be any restitution that actually
7 provides a benefit for victims, that these statutory fines that
8 are, I think, another manifestation of an intent by Congress to
9 express its visceral reaction to these offenses, that I think
10 probably is the visceral reaction that all of us have, but it
11 almost, along with the restitutionary portion of it, seems to
12 be -- have an element of an ephemeral promise, because by the
13 time you look at what the guidelines recommendations are, the
14 likelihood of that person being able to be in a position where
15 they can pay those enhanced fines or any meaningful restitution
16 in most instances involving offenses like this is few and far
17 between.  But I do want to at least address that before I go
18 into my actual analysis for purposes of the sentence itself.

19    So, Mr. Baldwin, I saw you looking at the statute book
20 when I mentioned that.  Did you come up with what you think is
21 the appropriate fine level for the triple-header that this
22 offense seems to require us to deal with today?

23    MR. BALDWIN:  Your Honor, I think the 2259A penalties
24 are at the discretion of the Court.  They have a maximum amount,
25 and the government isn't seeking in addition any sort of amount

1  under that statute, 29 -- 2259A, which is the --

2      THE COURT:  So let -- you're way ahead of me on this.

3  Let's just do it one at a time.  We have the $100 mandatory

4  special assessment times three.

5      MR. BALDWIN:  Yes, Your Honor.

6      THE COURT:  So that's mandatory.  There's no

7  discretion with that.  The rest are -- the $5,000 add-on is

8  ability to pay.  I have a hard time finding that he's going to

9  have an ability to pay that.  Is the government seeking that

10  5,000 here or does the government dispute his ability to pay

11  that 5,000?

12      MR. BALDWIN:  Your Honor, I don't believe the

13  defendant currently has the ability to pay that 5,000, and --

14      THE COURT:  Because that -- if I impose the sentence

15  that the government has requested, it's -- we have a pretty good

16  bet that that's -- he's never going to have that opportunity,

17  would you agree?  He'll be 110, by the time he gets out, if I

18  did the math correctly.

19      MR. BALDWIN:  Yes, sir.  I mean, the government is not

20  focused on that.  The -- it -- you're referring to the $5,000

21  additional assessment.

22      THE COURT:  Yes, yes.

23      MR. BALDWIN:  Yes, Your Honor.  I mean, typically in

24  these cases, we've said, let's see what happens down the road,

25  but I do agree, it's a lengthy period of time down the road, and

1  the government is more focused on the restitution piece of this.

2  THE COURT:  So could we live with this?  Let me throw

3  this out there.  I could say the 5,000, if at the time, there is

4  an ability to pay, he has the ability to pay it.  So it's there,

5  but it's qualified, right?

6  MR. BALDWIN:  Yes, Your Honor.

7  THE COURT:  And then the other ones are maximum fines

8  and the discretion, I would think that that's probably overkill

9  here, just in terms of reality; would you not agree to that?

10  MR. BALDWIN:  Yes, Your Honor, we -- and we're not

11  requesting that the Court would order any of those additional

12  fines under 2259A.

13  THE COURT:  Okay, all right.  Thank you.

14  MS. OYER:  Your Honor, with respect to the $5,000

15  special assessment, I guess I would object to the Court doing it

16  that way, because I think that if there -- it's due and payable

17  today, the special assessment, if the Court imposes it, and

18  Mr. Gilbert, based on the presentence report, clearly does not

19  have the means to pay that, and if -- in theory, you know, if

20  his family's able to send him any small amount of money while

21  he's incarcerated, that could be taken and garnished to go to

22  the special assessment, and that would prevent him from

23  potentially being able to communicate with his family by phone

24  and that sort of thing.

25  THE COURT:  Okay.  So I'll -- that's a good point to

keep in mind when I actually announce the sentence. All right.

MR. BALDWIN: Your Honor, I would just make a correction there. That money would not go to the special assessment. Under the statute, restitution has priority over that allotment under the law. Thank you.

THE COURT: Got it. All right.

(Conference at the bench.)

It is the policy of this Court that every guilty plea and sentencing proceeding include a bench conference concerning whether the defendant is or is not cooperating.

(Open court.)

THE COURT: So these cases, particularly the production cases, as we have here, create, I think, the most challenging test of how the underlying intent behind the sentencing guidelines play out in real life.

The notion was, is that the enormous discretion that judges have in sentencing defendants created a situation where there was great disparity throughout the country, different regions in the country and different judges and different Courts approached various offenses, created the circumstances that understandably resulted in a belief that there was too great a level of variance in the non-guideline sense, but just variance in terms of discrepancies between what judges were giving to defendants being sentenced for similar offenses with similar criminal histories.

And the statute that created the Sentencing Commission and the work that the Sentencing Commission did was intended to have the support, the empirical support that Ms. Oyer made reference to, to back up the decisions, so that it could take the best information that we had available from lawyers and judges, lawyers on the side of the government, lawyers on the side of the defense, social scientists, so that the notion of deterrence and the notion of all the underlying rationale supporting the criminal justice sentencing procedure could be factored in.

And they were supposed to be based upon analysis and information that would allow them to have the acceptance of the criminal justice community and, hopefully thereafter, the American public, that there was a rationality to the distinctions that were being drawn.  That was the -- that was the goal, and that was the utopia.  In many instances -- I mean, if you come to the guidelines initially without ever having dealt with them before, it's a remarkable undertaking and remarkable amount of work, with analysis, the qualifications, all the things that they do and then bringing them together.

But what has happened in certain instances is that because the legislative branch was involved in the creation of them and has a role in the -- certainly passes statutes which create mandatory minimums and impose fines, you have gotten in certain areas where those who measure the existing guidelines by

the standards that they were supposed to achieve when the
Commission was originally conceived of and took place feel that
where they come out is -- in some instances is a far cry from
what they are supposed to be.

This in turn leads to arguments that the Court should
not give deference or weight to the guidelines.  Not in the
calculation of the guidelines, of course, because the Court is
required to do that, but in the final aspect of the analysis,
the 3553 factors, such as the argument that Mr. Macbeth made
reference to now.

The Courts are required to impose sentencings against
defendants who have committed horrible offenses.  In the last
two weeks, I've had two cases that give an example of this.  In
one, the defendant was charged in a RICO conspiracy with two
murders for hire and a controlled dangerous substances
distribution.  And in that case, one of the murder for hire
involved him accepting money to go and shoot point-blank a
person who he was paid to eliminate and his girlfriend, who had
the misfortune of sitting right next to him, which resulted in
two deaths, and then, he was given a contract for another, who
he shot multiple times and that person survived, although
grievously wounded.

The C plea request in that case was for 29 to 36
years' imprisonment.  I think we would all agree that a person
who takes money to assassinate other individuals, in two

separate occasions, and kills two people and grievously wounds

another, committed a reprehensible offense for which the

sentence should be as harsh a sentence as probably most of us

could imagine in our ordinary frame of mind.

The other was a sentencing involving three separate

criminal charges.  The first involved two Hobbs Act robberies,

where firearms were used in furtherance of a crime of violence,

and the second involved three Hobbs Act robberies, one of them

the United States Post Office, where people walked -- stormed

the post office, wearing hoods and masks and carrying

semi-automatic weapons, and stole money, and robberies of two

businesses.  And there were three brandishing charges on that.

And the third was conspiracy to commit murder for hire.  The

total sentence in that, as part of an agreement, was 51 years,

51 years.

Now, one would think that a total of six Hobbs Act

robberies involving weapons, not just present, but brandishing,

and a conspiracy to commit murder for hire would be at the far

right-hand side of the bell-shaped curve, yet under the

guidelines and in accordance with the facts and circumstances of

those, which took into consideration a lot of factors that

focused on the individual defendant and other factors, those

sentences, which by any calculation were serious sentences, were

the ones imposed.

In this particular case, the outcome of the guidelines

is off the charts.  It's -- the calculation in this case, the

numerical calculation, comes to 51 points for the offense level,

which is eight points above the highest level that the

guidelines have, so it gets brought down.  And the criminal

history category becomes irrelevant, whether it's a I or a VI.

The whole notion that you look, as part of the -- looking at the

severity of the offense, at the prior history of the defendant,

as measured by the severity of the offense calculated by the

offense level and the criminal history of the defendant, it

becomes irrelevant when every single one of those possible

offense levels or criminal history categories is life or the

maximum that the statute would allow.  It gives no weight

whatsoever to the individual characteristics of the defendant as

opposed to an assessment of the severity of the crime.

        And that's why the concern when, in the past, the

guidelines were -- had to be interpreted by Courts as if they

were binding, which is not the case anymore, which brings us to

the 3553 factors, which allows the Court to try to make sure

that it is faithful to what the factors are that must be looked

at in each individual case, tailor a sentence that is

sufficient, but no greater than necessary, to accomplish the

goals of sentencing.

        And that takes into consideration the offense,

of course, the victims of the offense, which in this case are

truly victims in every sense of the word, and also the

characteristics, the individual characteristics of that

defendant, and looks at those and gives them weight and

evaluation as well as what the guidelines say and what other

people have gotten for similar sentences.

Now, the defense has asked me to give no weight to the

guidelines in this particular case involving child pornography

offenses, and I understand why they say that, for the reasons

that Mr. Macbeth set forth. The Fourth Circuit, of course, has

said that the Court may not simply disregard Congress' policy

judgments in connection with sentencings in these types of

cases.

In *United States v. Johnson*, a 2007 Fourth Circuit

case, 242 F. App'x 7, at Pages 11 and 12, the Fourth Circuit

reversed a sentence for child pornography offenses and said as

follows: "The final procedural infirmity is the district

judge's failure to acknowledge and take into account Congress'

policy embodied in Section 3553(b)(2)(A)(ii) 6, that child

pornography crimes are grave offenses warranting significant

sentences. As originally enacted, this provision mandated no

less than the guideline sentence, but as required by Booker, we

have held mandatory language unconstitutional and excised it

from the statute.

Nevertheless, it remains true that a district judge,

in the course of selecting an appropriate sentence, ought to

give respectful attention to Congress' view that child

pornography crimes are serious offenses deserving serious

sanctions.  We see no record evidence that the district judge

considered Congress' policy judgment concerning child

pornography offenses in granting a variance.  Together with the

others described here, this procedural shortcoming is sufficient

to render the sentence procedurally unreasonable.

And more recently in 2012, *United States v. Strieper*

at 666 F.3d 288 at 296, that the Fourth Circuit considered the

arguments that the guidelines -- sentencing guidelines for child

pornography were developed pursuant to congressional dictates

rather than Sentencing Commission experience, rejected that and

again cited a series of cases in which they had repeated the

notion that the court must consider and give respectful

attention to the policies of Congress in these guidelines.  And

that includes the argument that the guidelines were not based

upon empirical data and were not entitled to deference.

In the *United States v. Eertmoed*, 653 F. App'x 191 at

192 (4th Cir. 2016), the Fourth Circuit says they have

instructed the Courts to give respectful attention to Congress's

view that child pornography crimes are serious offenses

deserving serious sanctions.

So while I am going to give a sentence in this case

that takes into consideration the arguments that deal with the

background and characteristics of Mr. Gilbert as an individual,

I want to take a moment to talk about that respectful attention

that I am required to give to the congressional mandates.

This case is not just a child pornography case. There is an element of that, of course, because there's possession of child pornography. This case is a production case, the creation of child pornography, and -- and I think that no doubt, Congress, in the policies that it wanted in place for these offenses, is influenced by the experience that you have when you read the victim statements of the victims of production of child pornography and its publication in the internet, which is where it's published.

These -- these young victims have a lifetime to revisit the worries that the events -- the acts that they were subjected to, often by family members or people who were trusted, as opposed to strangers, and it's not just the trauma of the act themselves, where we know that the endurance and the resilience of humans oftentimes can overcome the most awful of trauma, over time, with care and with treatment. You can't do that when you're forced to confront the trauma constantly, because again, perhaps an unintended adverse consequence, every time one of these victims in a criminal case whose images are in the child pornography database is told that their images were in a case like this, so that they could be given the opportunity for restitution, that reminder is there, that -- forever, in the internet.

There are images of them when they were totally

vulnerable, often in the hands of adults, sometimes those who
were supposed to be caring for them, subjected to conduct which
is likely to generate the -- nothing but a visceral reaction
from anyone who has any concern about children.  These are --
these are children, these are children who are too young to
protect themselves from the events that occur there.

And you read about it, as examples in this case show;
you read about the nightmares they have, you read about the
distrust they have for individuals, you hear about the loss of
self-esteem, you hear about the seclusion that they are in,
because they're afraid to go out, they think people are looking
at them or commenting on them.  You hear about their failures in
school and to have social engagements.  You hear about the
impact it makes on their ability to socialize with others and to
be in a situation where they can have a family themselves if
they wish to do so.  And you hear about how, in some cases, they
get stopped by people on the internet who -- and they realize
that those images are out there of them when they were most
vulnerable, and most victimized, and most helpless, out there.
Not just out there for people to see, but for people to get
sexual satisfaction out of seeing.

And I think it is that aspect of what we see
perpetually.  I mean, I guess the government would never submit
it if we got a victim impact statement where the victim said,
well, yeah, this happens, and I know it's on the internet, but

there's so much junk on the internet that I'm over it, I'm doing

pretty good. I'd like some restitution so I could get

counseling, but I'm doing pretty good. That doesn't exist.

They are devastated; they do have a life sentence.

And -- and this case combines the production of the pornography.

One of the victim was two years old, 24 months old when these

acts occurred.

Now, Mr. Gilbert, I am going to say more about the

comments you made and what the other people said about you

because Ms. Oyer is right, you -- the -- if we talk about

Dr. Jekyll and Mr. Hyde, the Mr. Hyde we've heard about, but

there is a part of you that has a family that respect and love

you and want to stand by you, and I listened to what was a

difficult series of interviews with the FBI. Ms. Oyer, you

submitted those. I listened to them.

It was clear from those interviews that the analysis

that was done as part of the evaluation done of Mr. Gilbert by

Dr. Lane talk about what you had to endure in your life, and

what I want to have you think about, Mr. Gilbert, is that the

terrible things that happened when you were young, the ear

infections, how it affected your speech, the bullying that

ultimately resulted in you leaving school and feeling that you

were exposed and vulnerable because of those things that you

couldn't control, that is part of what contributed to the person

that you are, but that's exactly what your conduct did to these

victims, that they are -- they are not just worried about going
to middle school and high school and having people view them,
they're worried about people throughout the world looking at
their images on the internet.

And I understand, I have enormous respect for the
skill that Ms. Oyer brought in the balanced analysis in her
presentation, I understand that people act when they are -- they
don't choose to become pedophiles, they're that way, and they
act on that, but as the government pointed out, and I think it's
correct, the -- it's more than just the act; it was the
videoing, the going on the dark net, which -- if there's a
legitimate purpose for the dark net, I've not been made aware of
it; it's where people go to do things that otherwise would get
them in trouble, and no one who goes on there can reliably be
heard to say otherwise.

And the text messages, the comments, the postings in
this case, as -- when you read those and then you think of it in
the context of these young children, the oldest was five to
seven when this occurred, the youngest was two years old, that
is what makes it particularly difficult, Mr. Gilbert, because
you -- you didn't just view child pornography, you didn't just
possess it, you didn't just share it with others; you created
it, and you put it on there specifically so that others could
enjoy it, and enjoy it at the expense of these children, who
were -- I mean, one was essentially an infant.

1          And that's what makes it serious, Mr. Gilbert.  And I

2     know you know that on one level, but I want you to understand

3     that these victims will never get out from underneath that, the

4     events of that; they just won't, they won't.  Four years old and

5     always -- already suffering the problems that we see here.  And

6     I think it's this that is what is animating the thinking of

7     Congress as it sets these standards.

8          It is hard for a Judge to balance contract murder,

9     kill two people, shoot one person, terrible crime, and then try

10    and balance these, because they are all horrible crimes.  It is

11    true that -- that a sentence of someone for child production --

12    or production of pornography and possession often -- I mean,

13    there's somewhat of an irony to it, because the sentences are

14    very, very long, but then when supervised release comes out,

15    they're to include treatment, and certainly, as Ms. Oyer pointed

16    out in her excellent memorandum, there's a lot of scientific

17    authority, anyway, that this is a condition that, with proper

18    supervision, isolation from victims, children, can have

19    successes as evidence of the fact that the supervised release

20    conditions require it.

21         And so there's another sort of perverse irony in that

22    the defendants can begin to get treatment for their problems the

23    minute they begin their custodial sentence, if they're assigned

24    to a sex offender treatment program in the Bureau of Prisons,

25    and then, thereafter, for as long as they're on supervised

release, whereas the treatment for the victims depends upon

enough restitution being actually received to give them

consistent and helpful treatment.

I guess, in a perfect world, legislation would not

only express the view of the legislators of how horrible these

offenses are, but also appropriate money for the victims to get

treated.  That would give some measure of parity to the victims.

It would be nice if the statutory focus was in a way -- focus on

the victims was done in a way that would provide them with real,

immediate, and sustained economic resources to get the treatment

that they need rather than through the method of restitution or

fines that are more theoretical than actual in cases of long

prison sentences.

Now, that's the reason why I am required and I do give

respectful consideration to Congress' considerations in regard

to these offenses in their policies with regard to the

guidelines and the statute, but Congress equally has commanded

in 18 U.S. Code 3553 that I consider all of the factors, not

just the factors that are peculiar to these -- or particular to

these types of offenses.

And there, I go to the sentencing memorandum that was

so capably put together by -- by Ms. Oyer.  I -- it is

interesting to me, Ms. Oyer, that when you read the kind of

literature that you cited in your memo about the treatment and

the scientific approach to how these offenses should be and the

scientific predictions based upon actual studies of recidivism,

and then you read the discussion in the cases so often cited by

the government where the courts are weighing in and saying the

recidivism rates are high and all that, and you just wonder,

where is the data that these folks are relying upon.

There is data that you cite that while you can never

treat a person to be other than how they were born with regard

to this kind of behavior, that you can treat them in a way that

develops inside monitors, mitigates risk, and improves the

individual in a way that they would never be improved without

it, and I have taken into consideration that.

I'm not going to go into detail on the psychosexual

evaluation from Dr. Lane, but it is clear that Mr. Gilbert

himself comes to this Court as a person who suffered from an

enormous amount of circumstances that sent him here today as a

person who has damaged himself.  You can hear that from his

interview with the FBI agents, and you can see the information

as it was presented in the report, the diagnosis of severe

depression, pedophilic disorder, social anxiety disorder, and

major depressive disorder, recurrent with psychotic features and

severe levels of symptomology for these.  Socially withdrawn,

highly anxious, exposed to conditions growing up that I won't go

into detail with but were set forth in the memo, isolation,

significantly delayed social interaction.

It is clear also that the psychologist's report

expresses the following: "It is my professional opinion that Mr. Gilbert is highly amenable for sexual-offense specific programming within the Federal Bureau of Prisons, as well as a community supervision outpatient, sexual-offense specific psychotherapeutic services post release from the Federal Bureau of Prisons."

So I've considered all of these, and in my mind, the sentence of 80 years, which is the guideline sentence which is less than a life imprisonment, at least in theory, would have Mr. Gilbert complete his sentence. If he lived to do so, he'd be 110 or more years old. And at that time -- and the odds are that it would be, since few people get that old, that is tantamount to a life imprisonment, but the Bureau of Prisons considers 40 years a life imprisonment for purposes of their programming matters.

And so in my mind, a sentence that takes into consideration, respectfully, the policies expressed by Congress, that particularly keeps in mind the victims' statements of the torment that they continue to endure as a result of this, but also takes into consideration that Mr. Gilbert is being sentenced as a person who is far less whole than other individuals who did not have the events in their lives that are depicted in the report that was prepared by Dr. Lane.

So the sentence that I believe is sufficient, but not greater than necessary, to promote the functions of 18 U.S. Code

1 3553, that gives respectful recognition to the policies

2 articulated by Congress but also balances the information that

3 helps us define in a more three-dimensional way Mr. Gilbert

4 would be as follows.

5 For Count Three, Production of Child Pornography, I

6 sentence him to 300 months of incarceration; to Count Six,

7 Production of Child Pornography, I sentence him to 300 months of

8 incarceration to run concurrently with Count Three; and for

9 Count Nine, possession of child pornography, I sentence him to

10 240 months, to run consecutive to the 300 months, for a total

11 sentence of 540 months.  That's 45 years.

12 Now, I read and spent a great deal of time thinking

13 about the letter from the mom of one of the victims, who urged

14 me to impose an 80-year sentence.  I don't know of any parent

15 who would not agree with that, but my job as a judge is to do

16 what I am required to do, which is evaluate all of the factors

17 that go into this.  A 50 -- 45-year sentence for a 34-year-old

18 man would have him eligible for release at almost 80 years old,

19 combined with lifetime supervised release with treatment, by any

20 measure, that is a sentence that is a serious sentence.  I will

21 be recommending that he be assigned to one of those Federal

22 Bureau of Prisons facilities that has a sexual offender program

23 so that he can begin the treatment there immediately.

24 But I will also impose lifetime supervision, and that

25 would be for each of the three counts, and that would be to run

concurrently, obviously, with the supervision.  I will not
impose a fine.  A $300 special assessment for each of the
substantive offenses is mandatory, restitution to be determined
either by agreement or after a hearing, to be concluded within
90 days, and I am not going to impose the $5,000 fine, because
he does not have the ability to pay that presently, and I doubt
that he ever will, but more importantly, if I were, then he
would be unable to even get the meager items in commissary that
a person who is incarcerated can get if they work at the wages
that they earn in incarceration or have family members
contribute.  That would all be taken, and that would add to the
severity of the conditions of confinement.

If I thought that the sentence was one that would
release him early enough for him to get out and make money, I'd
keep that $5,000 fine, but he certainly doesn't have the ability
to pay it, and if he serves his sentence, he never will, so I'm
not going to do that.

The conditions of supervision, I'm going to go through
those now.  They are as follows.  The mandatory conditions are
this.  Mr. Gilbert may not commit another federal, state or
local crime, he must not unlawfully possess a controlled
substance, he must refrain from unlawful use of a controlled
substance and submit to drug testing as directed by the
Probation Department.  He will make restitution in an amount
either agreed to by the parties or ordered by the Court after a

1   hearing that will take place within 90 days of today's date.  He

2   must cooperate in the collection of DNA as directed by the

3   probation officer.  He will comply with the Sex Offender

4   Registration and Notification Act as directed by the probation

5   officer, and he is not required to participate in a domestic

6   violence program -- Shante, that's not part of that.

7          The standard conditions are as follows.

8          He must report to the probation office in the federal

9   judicial district where he's authorized to reside within 72

10  hours of his release and follow the instructions of the

11  probation officer if different from that.

12         No. 2, after initially reporting, he'll receive

13  instructions on how to report to probation.  He must comply with

14  those.

15         No. 3, he must not knowingly leave the federal

16  judicial district where he's authorized to reside without

17  advance permission from the Court or probation officer.

18         No. 4, he must truthfully answer questions posed by

19  the probation officer.

20         No. 5, he must live at a place approved by the

21  probation officer and give ten days' notice before a change or,

22  if that's not feasible, within 72 hours of becoming aware of a

23  need for a change.

24         (6) he must allow the probation officer to visit him

25  at any time at home or elsewhere, and if the probation officer

sees materials that they are prohibited by conditions of supervision, they may be seized, if they are in plain views.

He must work full time at a lawful employment approved by the probation officer unless excused from doing so and may not change the job, if approved, without 10 days' advance notice or within 72 hours of becoming aware of a change if the 10 days' notice cannot be given.

(8) he must not communicate or interact with anyone known to be involved in criminal activity, and if they've been convicted of a felony, he may not communicate or interact with them without getting permission from the probation officer.

If arrested or questioned by law enforcement, he must report to the probation officer within 72 hours.

(10) he must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon, including anything that has been designed or modified for causing bodily injury or death.

He must not act or make any agreement with law enforcement to act as a confidential human source without permission of the Court.

(12) if the probation officer determines he poses a risk to another person or organization, he may be required to give them notice about the risk and demonstrate to the probation officer he has done so.

And must -- finally, No. 13 -- follow the instructions

1    of the probation officer related to conditions of supervision.

2         The following special conditions are also part of it.

3         No. 1, he must participate in a sex-offense specific

4    treatment program and follow the rules of that program; (2) he

5    must not view or possess any visual depiction as defined by 18

6    U.S. Code 2256 that would fall within the definition of that

7    statute regarding pornography; and, No. 3, he must not have any

8    direct contact with any child he knows or reasonably should know

9    to be under the age of 18 without permission of the probation

10   officer.

11        Additionally, he must -- No. 4, he must allow the

12   probation officer to install computer monitoring software on any

13   computer that he uses.

14        (5) he must submit computers that he uses to a search

15   as well as electronic data storage devices that maybe associated

16   with that.

17        Next, he must -- to ensure compliance with that, the

18   probation officer will be authorized to conduct initial and

19   periodic unannounced searches of any computers and to determine

20   whether or not they've been used for a prohibited person, and he

21   must warn other people who use those computers that they may be

22   subject to searches.

23        Additionally, I'm going to order a mental health

24   treatment program and that he follow the rules of that program.

25   Next, he may not communicate or otherwise interact in any way

with the victims in this case without getting the permission of the probation officer.

He'll make any outstanding restitution ordered by the Court at a rate of at least $100 a month, beginning with his probation, and pay a $300 special assessment.

In addition to recommending that he be placed in a facility at BOP that has a sex offender treatment program, if that program itself has mental health treatment, then it need not be duplicated, but I'm going to recommend an additional what would be mental health treatment while he is in, serving his custodial sentence as well.

This sentence, I believe, gives the respect I am required to give to Congress' policies and views on these offenses without sacrificing my obligation to evaluate this case based upon the totality of all the factors that are in 18 U.S. Code 3553, including the circumstances and conditions of Mr. Gilbert himself.

The counsel will confer with each other and give me -- let me know within 14 days if they have been successful in agreeing upon restitution. If not, then I will set a hearing to determine that. If either party believes -- Mr. Gilbert, if you believe that, as a result of this sentence, that you have an unwaived right to appeal, you must do so within 14 days of the entry of a judgment of conviction or any entry of appeal by the government.

1          Are there any other outstanding charges that need to

2     be dismissed against him?

3          MR. BALDWIN:  Yes, Your Honor, we -- the government

4     moves to dismiss the charges other than Counts Three, Six, and

5     Nine.

6          THE COURT:  All right.  Those charges are dismissed.

7     Anything further from the government, Mr. Baldwin?

8          MR. BALDWIN:  Yes, Your Honor.  Can you -- just if you

9     would note for the record orally that the forfeiture order has

10    been entered in the case.

11         THE COURT:  Oh, yeah, it has been entered.  Thank you

12    for reminding me, yes.  Anything further, sir?

13         MR. BALDWIN:  No, Your Honor.  I think we'll be able

14    to work out the restitution in short order.  Thank you.

15         THE COURT:  Okay.  Ms. Oyer, on the recommendations,

16    anything I left out that you want in my recommendation, ma'am?

17         MS. OYER:  Your Honor, I'd ask if the Court could

18    include a recommendation that Mr. Gilbert be designated to the

19    BOP facility in Petersburg, Virginia, which I believe does offer

20    a sex offender treatment program.

21         THE COURT:  I will.

22         MS. OYER:  Thank you, Your Honor.

23         THE COURT:  Petersburg as well.  Anything further from

24    the defense?

25         MS. OYER:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Thank you all very much.

2    We're in recess now.

3          THE COURTROOM DEPUTY:  This Honorable Court now stands

4    in recess.

5       (The proceedings were adjourned at 11:13 a.m.)

```
 1                 CERTIFICATE OF OFFICIAL REPORTER

 2        I, Patricia Klepp, Registered Merit Reporter, in and for

 3   the United States District Court for the District of Maryland,

 4   do hereby certify, pursuant to 28 U.S.C. § 753, that the

 5   foregoing is a true and correct transcript of the

 6   stenographically-reported proceedings held in the above-entitled

 7   matter and the transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9                           Dated this 1st day of February, 2022.

10

11
                          _____/s/_____
12                        PATRICIA KLEPP, RMR
                          Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```